MacKAY v. COSTIGAN et al. (two cases).

Nos. 9836, 9838.

United States Court of Appeals
Seventh Circuit.

Jan. 17, 1950.

John H. Bishop, John M. Falasz, Chicago, Ill. Bishop, Mitchell & Burdett, Chicago, Ill. for MacKay.

Robert L. Epstein, Chicago, Ill. John E. Toomey, McCarthy, Toomey & Reynolds, Chicago, Ill. Frank A. McCarthy, John J. Moran, Chicago, Ill., for Costigan.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

FINNEGAN, Circuit Judge.

This is a proceeding to contest the will of Margaret MacKay, deceased. Federal jurisdiction is based on diversity of citizenship. The plaintiff, Albert E. MacKay, is a citizen and resident of the State of Oregon. He is the uncle and only heir at law of Margaret MacKay, deceased. The defendants including the executor of the estate of Margaret MacKay and the legatees under her last will and testament are all citizens and residents of the State of Illinois. Three of the legatees are minors and are represented by a guardian *ad litem* appointed by the court. The estate disposed of by the will was valued at approximately $35,000.

The complaint alleges that on or about June 27, 1946, Margaret MacKay executed a certain instrument in writing purporting to be her last will and testament, in which she devised and bequeathed all of her estate as follows: 15% to Leo, Frank and Stephen Manta; 30% to Bess Nelson; 25% to Grace Kahl and 30% to Edna S. Costigan; that no devise or bequest whatsoever was made to the plaintiff, the sole relative and heir at law of testatrix.

It is stated that said instrument was admitted to probate in Cook County, Illinois on January 6, 1947, and that letters testamentary issued from the Probate Court of Cook County to Robert P. Sullivan, executor named therein.

The complaint avers that prior to 1941, Margaret MacKay with her sisters Katherine MacKay and Ida Harley, lived with their aunt Margaret McTavish in Chicago, Illinois; that in the latter part of 1941, Margaret McTavish died leaving the bulk of her estate to Margaret and Katherine MacKay. It is charged that during the last illness of Margaret McTavish, the defendant Edna S. Costigan was employed as her nurse; that after the death of their aunt Margaret and Katherine MacKay continued to reside together in Chicago, Illinois, and that for several years, or until about 1945, Edna S. Costigan continued to live with them, acting as housekeeper and nurse. It is then alleged that in 1945 the defendant Grace Kahl was employed as housekeeper and nurse and continued such employment until the death of Katherine MacKay in May, 1946; that thereafter said Grace Kahl remained as nurse and housekeeper until the death of Margaret on April 16, 1947.

It is averred that after the death of her sister, Margaret continued to reside in the same apartment; that Grace Kahl continued as housekeeper and nurse for Margaret. She managed the household affairs; that Edna S. Costigan was a frequent visitor at the apartment; that she advised, and counseled with Margaret on social, personal and business affairs; that Margaret was seventy-four years old and physically frail and feeble; that her hearing was badly impaired; that she had been under the care of her family physician for more than ten years; she was greatly affected by her sister's death, from that time her physical condition deteriorated and she failed rapidly. It is claimed that about June 1, 1946, Grace Kahl discharged the family doctor and refused to permit him access to the apartment. It is charged that Margaret MacKay's daily existence was regulated, controlled and dominated by Grace Kahl and Edna S. Costigan; that they exercised over her a dominion and control so great that her mind was not free to deal with her property as she wished, that as a result, she dealt with it in accordance with the wishes of said Grace Kahl and Edna S. Costigan; that they by the use of undue influence induced her to execute the will described;

that said will was not the will of Margaret MacKay.

The complaint further charges that Daniel A. Costigan, a lawyer of Chicago, is the son of Edna S. Costigan, with whom he resided in 1946; that Edna S. Costigan was dependent upon him for her support and maintenance; that he drafted the will of Margaret McTavish, and that he was counsel for Margaret MacKay, who was executrix of the estate of Margaret McTavish; that in May 1946, Margaret MacKay employed Daniel A. Costigan as her attorney to draft her will. It is further charged that such employment created a fiduciary relationship, between Daniel A. Costigan and Margaret MacKay, and such relationship existed on June 27, 1946, when the will of Margaret MacKay was executed; that because of such relationship, Margaret MacKay reposed trust and confidence in Daniel A. Costigan, and that by reason of such relationship and the trust and confidence reposed, Daniel A. Costigan was prohibited from obtaining for himself any benefit, directly or indirectly, under the will of Margaret MacKay, but that Daniel A. Costigan, in violation of the relationship and trust reposed, induced said Margaret MacKay to execute the will which he had drafted, in which he named his mother, Edna S. Costigan, as one of the principal beneficiaries, and by reason thereof the said will of Margaret MacKay was executed under undue influence and was not the will of Margaret MacKay. The complaint further states that Daniel A. Costigan had himself appointed conservator of the estate of Margaret MacKay, and he was acting as such at the time of her death.

All of the defendants answered. The complaint as originally filed also charged that Margaret MacKay was mentally incompetent at the time of the execution of the will. This charge was withdrawn. Defendants Grace Kahl and Edna S. Costigan denied generally and specifically the pertinent allegations of the complaint.

At the close of the plaintiff's case, a motion was made by the defendants to instruct the jury to find for the defendants. The court reserved ruling on this motion until the close of all the evidence. At the close of all the evidence, a motion for judgment for the defendants was renewed, upon which the court also reserved its ruling. The case was submitted to the jury on the evidence heard and the jury returned its verdict finding that the written instrument produced and offered was not the last will of Margaret MacKay deceased.

The defendants then moved for judgment *non obstante verdicto,* and, in the alternative for a new trial.

The District Court after argument and consideration of the authorities, submitted by the respective parties, sustained the motion for judgment notwithstanding the verdict and dismissed the complaint at plaintiff's cost. At the same time it overruled defendants' motion for a new trial.

These appeals followed. Plaintiff appeals from the action of the District Court in entering judgment for defendants notwithstanding the verdict. Defendants have also appealed from the court's ruling denying their motion for a new trial, and from the order of the District Court directing that the guardian *ad litem's* fee be assessed against the estate of Margaret MacKay, deceased.

We first direct our attention to the action of the trial court in sustaining defendants' motion for judgment notwithstanding the verdict. The law is well settled that in passing upon such a motion the trial court must be governed by the same rules which govern it in passing upon a motion for a directed verdict. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147; Merlo v. Public Service Co., 381 Ill. 300, 45 N.E.2d 665. The motions are in effect the same; they present only a question of law as to whether or not, when all of the evidence with reasonable inferences therefrom is considered in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case.

As was said in Knudson v. Knudson, 382 Ill. 492, on page 494, 46 N.E.2d 1011, 1012:

"The rule is that where there is any evidence tending to prove the cause of action,

it is error to direct a verdict, and this is true in a will contest as well as in an action at law. * * * The question presented by a motion for a directed verdict, or for a judgment *non obstante veredicto,* is whether there is any evidence fairly tending to prove the cause of action or the fact affirmed. The court, on such motion, does not weigh the evidence nor consider its preponderance."

We must therefore in order to pass properly on the trial court's action in entering judgment notwithstanding the verdict, review the evidence in the case at bar. This we shall do as briefly as possible.

The record shows that the deceased, Margaret MacKay, was the last survivor of three (3) sisters who during their lives lived with their aunt Margaret McTavish in an apartment on the South Side of Chicago. The aunt died in the latter part of 1941. Edna S. Costigan, one of the legatees named in the will, was employed as nurse during the last illness of the aunt, Margaret McTavish. On the aunt's death the sisters continued to live together in the apartment, Mrs. Costigan remaining as housekeeper until 1945. Ida Harley, one of the sisters, died in 1945. She was the mother-in-law of John Manta who in 1923 had married a daughter of Ida's. This daughter lived only eighteen months after her marriage to John and left no child. John Manta continued to be close to the family and three of his minor children born to his second wife, are named as legatees in the last will of Margaret MacKay, here in question.

In 1945, Mrs Costigan left the employment in the MacKay family, and was succeeded by Grace Kahl. Both Mrs. Costigan and Grace Kahl are legatees under Margaret's will. The other legatee, Bess Nelson, was a friend of Margaret for many years.

The evidence shows that Margaret was about seventy-four years old, that she was frail and of a somewhat nervous disposition. She was apparently an unobtrusive person. Yet she did act as personal representative of the estate of her aunt Margaret McTavish and later on took charge of the affairs of her sister Katherine.

The first witness produced by the contestant was Jean Taylor, an old friend of the family. She testified that about two weeks after Kate's death, she suggested that Margaret give up the apartment which they had been occupying and come to live with Mrs. Taylor. Margaret said she could not come, that things were in such condition that she could not do the things she might want to do, that she had the apartment on her hands, and would have to bide her time until she could do something. She said she could not give up the apartment at that time because Mrs. Kahl was there and was taking charge of things the same as she had before.

Stella Ryle, an old friend of the family, also visited Margaret after the death of Katherine and before the execution of the will in question. Margaret was nervous and cried all the time her friend was there. Margaret asked her to help her dispose of her diamonds and of a silver set. Whilst talking, Margaret kept looking back and said she did not want Mrs. Kahl to hear her.

Anna M. Poirier, a nurse employed during Katherine's last illness, said that an hour or two before her sister's death Margaret took out a box of jewelry, handled the items and laid them out piece by piece, and offered the witness a chain which she did not take. Mrs. Kahl then had her put everything back.

Dr. Cuthbertson, a practitioner since 1894, was the family doctor. He attended, during their lives, Mrs. McTavish, Ida Hartley and Katherine MacKay. He did not attend Margaret in her last illness. He testified that a few days after Katherine's death, Mrs. Kahl told him that Margaret was not capable of handling her financial affairs, that she was not well, and that Mrs. Kahl said she must stay and take care of her and must have nine dollars a day. He also testified that he twice thereafter attempted to visit Margaret; that he called at the apartment; that Mrs. Kahl told him Margaret was out. He never again saw Margaret.

The next witness was John Manta. He had married a niece of Margaret's in 1923. His wife died about eighteen months after their marriage, but he remained a close friend of the family. He had a key to the apartment. After Katherine's death, he asked Margaret to come and live at his home. He had remarried and his children by his second wife were among the beneficiaries named in Margaret's will. Mrs. Kahl told him Margaret was not mentally well and would wreck his home.

He had a talk with Margaret early in June or in the latter part of May. He went with her to the Continental Illinois National Bank and established a joint bank account, before that he also went to the Woodlawn Bank where he did the same thing. He did not fix accurately the date of either visit to the bank.

Venita Trainor, a friend of the family for many years, testified that at Margaret's direction she was told to ask Mrs. Kahl whether or not she could see Katherine during her last illness. Margaret said: "That is her attitude toward our friends." After Katherine's funeral she again visited Margaret and found that she had forgotten that Miss Trainor had attended the funeral. Mrs. Kahl often told witness that Margaret would not know her if she called. She felt from her conversations on the phone that Mrs. Kahl did not welcome her visits.

Oliver W. Reese, assistant cashier of the South East National Bank, testified that he visited Margaret MacKay's apartment in March 1947. Mr. West, from the Continental Illinois National Bank, Mrs. Kahl and Miss MacKay were present.

The question discussed was whether or not Margaret wished to make her account a joint account with Mrs. Kahl.

Papers were prepared to set up an account in joint tenancy with Mrs. Kahl. The account was not set up as projected. The joint account of Margaret MacKay and John Manta, which was then current, continued until a conservator was appointed. This account contained $7,095.

Maurice C. West, a clerk of the Continental Illinois National Bank, testified that a joint account between Margaret MacKay and J. L. Manta was opened on May 24, 1946. On March 25, 1947, a savings department order signed by Margaret MacKay withdrew $26,873.92 from this account, which was paid by cashier's check in that amount, payable to the Bank of Montreal for account of Margaret MacKay.

This witness called at the home of Margaret MacKay with a representative of the South East National Bank on March 18, 1947. They went to help their customer at the request of attorney Costigan.

William F. McLeod, an employee of the Bank of Montreal, was next called. He produced the records of the bank in connection with the account of Margaret MacKay.

Daniel A. Costigan, the attorney who drew the will in question, was called as a witness on behalf of the contestant. He was also called on behalf of the proponents.

He first met the MacKay family in their apartment in March 1939. His mother was then taking care of Mrs. McTavish, an aunt of Margaret and Katherine MacKay and Mrs. Ida Harley. He saw them once or twice during the spring of 1939, and in July 1939 drew Mrs. McTavish's will. Margaret MacKay was named Executrix. Mrs. McTavish died in 1941, a year and four months after executing her will. Margaret's health was good at that time. She brought the will to Mr. Costigan's office, and an estate was opened and the usual steps taken in the administration of the estate. Mrs. Costigan's employment terminated with the death of Mrs. McTavish. She had worked for her from 1938 to November 1941. However, she visited the girls frequently thereafter and they relied greatly upon her. Mr. Costigan later represented Margaret in connection with the purchase of some Canadian securities. On one occasion she asked Mr. Costigan to inquire whether she could purchase Canadian securities that were also traded in the United States and accordingly would not shrink by the exchange rate when transferred to the United States. Mr. Costigan found this to be true and purchased some securities in Margaret's behalf. Early in 1945 Ida Harley died and Mr. Costigan saw Margaret three or four times in connection with

securing a release from the Attorney General and State Treasurer to certain funds which were in a joint account in the name of Ida Harley, Katherine and Margaret MacKay. Margaret's physical condition remained good and Mr. Costigan observed no change in her from the first time he met her. Later in 1945 Mr. Costigan had numerous conversations with Margaret over a vacant lot at 26th and Wells Streets. Margaret objected to paying taxes on vacant property, and Mr. Costigan made an effort to sell it. He also saw her in connection with the transfer of certain securities which had been in the name of Katherine, Margaret and Ida Harley. Katherine died May 25, 1946. After her death Margaret came to Mr. Costigan's office on June 15, 1946, with two pass books for the Continental Illinois National Bank and affidavits were prepared to secure releases from the Attorney General and State Treasurer. Margaret accompanied Mr. Costigan to the Attorney General's office, and after securing a release they went to the Continental Illinois National Bank and opened a new account putting the proceeds of the old accounts which were in the name of Margaret and Katherine in Margaret's name alone. When Mr. Costigan and Margaret were either at the bank or the Attorney General's office Margaret remarked: "I guess I better have a will." Mr. Costigan then explained to her that inasmuch as she had no relatives in Illinois in case of her death her estate would be administered by the Public Administrator. She said she would be down soon and make out the will, and Mr. Costigan replied that she should think over what disposition she wanted to make of her property and have it pretty well organized in her mind before she came to his office. Later she telephoned Mr. Costigan and made an appointment and came to his office alone on June 27, 1946. She said she did not want to leave any money to John Manta, the surviving husband of her deceased niece, Marguerite Harley, because he had plenty and had never done anything for her in a financial way, but she did want to remember the children. She said she wanted to leave something to Bess Nelson because Bess and her husband

Oliver had been good friends of hers for many years. She said she wanted to leave something to Grace Kahl because she had been very good to us, worked seven days a week—twenty-four hours a day. She also said she wanted to remember Mr. Costigan's mother. Mr. Costigan asked if she wanted to remember her uncle Albert and she said no. Uncle Albert is 84 years of age, is very well fixed, and if she left it to him he would die and Doris, his wife, who was thirty years younger would get it. She said she wanted to leave the Manta children fifteen per cent (15%) or five per cent (5%) apiece, and if anything should happen to any of the children, the surviving children would take the decedent's share; if anything should happen to Bess Nelson she wanted her husband Oliver to get her share. With reference to Grace Kahl, she said she had no close relative known to her and if she died before Margaret she wanted her share to go to the other persons mentioned in her will. In regard to Mrs. Costigan, she said if anything happened to Mrs. Costigan her share could go to you boys, meaning Daniel and his brother. Mr. Costigan then asked whether or not she wanted John Manta to be Executor, and she said no, and asked Mr. Costigan to be Executor. Inasmuch as Mr. Costigan was drawing the will he preferred not to act as executor, and they named two men in Mr. Costigan's office. After the will was dictated and typed it was signed in the presence of Mr. Costigan and three attesting witnesses, one a lawyer, an insurance man and Mr. Costigan's secretary. The will was signed about 12:30 and Mr. Costigan offered to call a cab, but Margaret said she wanted to do some shopping and would then take the elevated. On July 1, 1946, Mr. Costigan sent Margaret a bill for drafting her will, and Margaret replied by letter on July 22, 1946, stating that she was enclosing her check in payment of same. She said that she did not feel satisfied the way it was made out and that John (Manta) suggested that she should have a simpler one and that he wished his name put in as Executor. She concluded by stating that if changing this was more expensive to let her know but not to destroy the will without no-

tifying her. Mr. Costigan replied on July 25, 1946, acknowledged her check and stated he would get in touch with Mr. Manta and work the matter out. Mr. Costigan then wrote Manta on July 25, 1946, stating in substance that he had drawn a will for Margaret MacKay and had it executed at his office. That afterwards Margaret told his mother that she was not satisfied with the will and had discussed the same with you. He suggested that Manta come in and see him so that something could be worked out that would be satisfactory to Margaret. Manta then came to Mr. Costigan's office and inquired why he was not made executor—and why his boys were not given more money. Mr. Costigan replied that the will was drawn in accordance with Margaret's instructions and Manta replied that she ought to have a simpler one and that she was nervous when she made the will. Mr. Costigan then told Manta that if Margaret wanted a new will she would have to come down and make a new one, that neither of them could make a will for her.

Margaret's physical condition was good after Katherine's death. She wrote many letters from time to time and had many conversations with her boarder. Her friends visited her after Katherine's death, and they observed no change in her since 1941. The church records show that she attended parties at the church during June, July and August 1946, which was after Katherine died.

In addition to the witnesses to the will of Margaret MacKay, and a receptionist employed in Mr. Costigan's office, the defendants produced a young man who boarded in the MacKay apartment after the death of Katherine, and two friends of Margaret; namely, Mrs. Hohmann and Olio Maines.

Dr. F. W. Fitz, who treated Margaret after Katherine's death, was also produced.

On November 14, 1946, she visited him for a generalized itching of the skin, he gave her a complete examination together with routine laboratory tests. He diagnosed her as a normal 74 year old woman. She gave a history of her complaint in a perfectly logical fashion, discussed her family history, the cause of her father's and mother's death, and of her sister. She told of her habits, her diet and past medical history. She returned to the doctor in December 1946, and there was generally speaking no change in her condition. The doctor next saw her on January 7, 1947, after she had lost consciousness and fell and sustained a fracture of the hip. She was taken to the hospital on January 11, 1947, and remained there about six weeks. The physician first noticed a change in Margaret while she was in the hospital. He explained that in cases of far advanced hardening of the arteries when they are put to bed they age rapidly. They become difficult to manage, become unhappy, refuse to eat and are critical, and he felt that this change took place in Margaret. She went home March 1st, and the physician saw her on March 5, 17, 29, April 9 and 12, and it was obvious that she was aging rapidly in mind and body. In March 1947 Mr. Costigan talked with a Mr. Boberg of the South East National Bank after which Mr. Boberg, and an officer of the Continental Illinois National Bank went to Margaret's home. A withdrawal slip signed by Margaret was received by Mr. Costigan and he took the withdrawal slip to the Continental Illinois Bank and withdrew the money on deposit in a joint account with her and Manta, and opened a new account in Margaret's name at the Bank of Montreal. The pass book was then returned to Margaret. Shortly after Mr. Costigan received a call from the Vice President of the South East National Bank and Mr. Costigan then prepared an application for the appointment of a conservator, on the grounds that she was wholly incapable of managing her estate due to advanced age and physical incapacity. He was appointed conservator on the 3rd day of April 1947, and withdrew the balance on deposit in the South East National Bank and opened a new account in his name as conservator. Margaret died on the 16th day of April 1947, and her will was admitted to probate in the Probate Court of Cook County on the 6th day of June, 1947.

There is, in the record at bar, absolutely no evidence whatsoever to show that either Grace Kahl or Edna C. Costigan exerted

any influence on the testatrix to induce her to make a will. There is a total failure to sustain the allegations of the complaint that the daily existence of Margaret MacKay was controlled and dominated by Grace Kahl and Edna S. Costigan; that they, or either of them, exercised over her a dominion and control so great that her mind was not free to deal with her property as she wished; that they or either of them caused her, by undue influence, to make the will in question.

If their influence and domination over Margaret MacKay was so complete, why did her last will and testament provide that 30% of her estate should go to her friend, Bess Nelson, and 15% to the Manta children?

 Moreover, as was said in Mosher v. Thrush, 402 Ill. 353 on page 358, 84 N.E.2d 355, 357:

"The law is settled that to avoid a will upon the ground of undue influence it must be directly connected with the execution of the will itself. It must operate when the will is made, and must be directed especially toward procuring the will in favor of particular persons, and must be of such a character as to destroy the testator's freedom of will, so as to render his will obviously the result of the mind and brain of some other person."

No person who is charged with exerting undue influence upon or exercising dominion over the mind of Margaret MacKay was present at or had anything to do with the execution of her last will and testament. It is true that Daniel A. Costigan, who had acted as her attorney, and who was a son of Edna S. Costigan, supervised the execution of her will. But no inference destructive of the validity of the will can be drawn from that fact. The general rule is that when a relative of the draftsman of the will is benefited thereby no presumption is raised as to undue influence. Annotation 66 A.L.R. 249, and cases there cited.

There is in this case, moreover, a most convincing answer to any attempt at inference that the will in question was not truly the last will of Margaret MacKay.

More than a month after the instrument was executed and after she had talked it over with her friend, John Manta, she wrote the scrivener:

"Chicago, Ill.
July 22, '46.
Dear Mr. Costigan:
Received your bill of July 1st showing balance due in execution of my Will made out when in your office, and am enclosing check for $30.00 to balance, although I do not feel satisfied the way it was made out, and realizing the nervous condition I was in then believe I was a little hasty and John suggested I wait until I was more collected, so I could have a simpler one. He also wished his name put in as one Executor. If changing this is more expensive, please let me know and do not destroy this one without notifying me.
Yours very truly,
Margaret MacKay.

I would have called you sooner, but your mother told me you were out of the city."

 Over objection of the defendants, the plaintiff, on his promise to connect it with the issue of undue influence, was allowed to put in evidence certain acts of Daniel A. Costigan in connection with having a conservator appointed for Margaret MacKay. No attempt to establish the promised connection was ever made. The evidence should therefore have been stricken from the record. It had no relevancy to or connection with the charge of undue influence.

 Under the facts and circumstances of this case, it is our opinion that the trial court properly entered judgment notwithstanding the verdict.

We deem it unnecessary to review or pass upon the action of the District Court in refusing to grant a new trial.

 The record shows that the guardian ad litem for the minor defendants rendered legal services which were of great benefit not only to the minor defendants but also to the other defendants in their effort to sustain the last will and testament of Margaret MacKay. Under such circumstances we believe the trial court properly ordered his

fees for such services to be paid out of her estate.

The judgment order of the District Court and its order directing that the guardian *ad litem* be paid out of the estate of Margaret MacKay are therefore affirmed.