**INTERNATIONAL HARVESTER COM-PANY, a Corporation**

v.

**The UNITED STATES.**

**No. 436–58.**

United States Court of Claims.

March 12, 1965.

Albert E. Jenner, Jr., Chicago, Ill., for plaintiff. Philip W. Tone, Thomas P. Sullivan, Thompson, Raymond, Mayer & Jenner, Chicago, Ill., of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DURFEE, Judge.

This is an action to recover $1,780,375.-20 deducted by defendant from a total of $17,307,183.67 which plaintiff was entitled to receive under a contract [1] for the manufacture of military vehicles for defendant. Defendant has asserted affirmative defenses and counterclaims against plaintiff which arose out of earlier vehicle procurement contracts, and thereby contends that plaintiff has been paid in full by offset.

In support of this offset, defendant first contends that plaintiff was paid $249,919.47 by defendant, under one of the earlier contracts primarily in dispute, for Federal excise taxes, but that plaintiff retained these monies despite the fact that plaintiff had been relieved from paying said taxes by the Bureau of Internal Revenue. We will refer to this hereafter as the Excise Tax Issue.

Defendant, by counterclaim, also claims entitlement to $490,533.08 which it contends it would have recovered in price redetermination proceedings under Contract 1216 had not such proceedings been thwarted by misrepresentations by plaintiff. This will be referred to as the Price Redetermination Issue.

Defendant further contends in support of its offsets that during the performance of the same earlier contract,[2] plaintiff received a refund of $1,529,737.90 from its subcontractor, the Rockwell Spring and Axle Company for the use of defendant, but that plaintiff did not pay this to defendant. Two counterclaims in the respective sums of $35.09 and $24,806.21 are also involved in this issue which will hereinafter be referred to as the Rockwell Issue, and which will be dealt with now.

### THE ROCKWELL ISSUE

During the period 1950 through 1957 plaintiff produced many thousands of motorized heavy-duty military vehicles and parts pursuant to a series of contracts between it as prime contractor,

and defendant. The earlier contracts are not directly involved in this case except by way of background. Essentially, they provided for retroactive or prospective price redetermination, upward or downward, within specified limitations hereinafter referred to.

Contract 297 was executed on June 30, 1951, between plaintiff and defendant, and contained an additional provision for price redetermination of plaintiff's subcontracts with suppliers of truck components, including axles. This contract contained a "pass through" provision that if the price of any subcontract was redetermined during a period when the prime contract price was fixed, the prime contract price would be correspondingly increased or decreased, notwithstanding the provision of the price redetermination article. Under this latter provision, the prime contract price remained fixed for a 90-day period following price revision.

During the entire period covered by this litigation, the sole source of axles for the trucks involved was Rockwell Spring and Axle Company and its predecessor corporation, Timken Axle Company. Under Contracts 11447 and 11448 dated May 18, 1951, defendant furnished facilities for manufacturing military truck axles at Timken's new Newark, Ohio, plant. Timken, in turn, agreed to maintain a specified axle capacity and to price redetermination to be negotiated by defendant at prices Timken charged prime contractors for axles.

On June 26, 1952, plaintiff and defendant executed Contract 983 which contained price increase or decrease redetermination clauses, retroactive or prospective, and a repricing of subcontracts article, including the "pass through" provision, as in Contract 297.

On March 31, 1953, Contract 1216 for 854 trucks was executed by plaintiff and defendant. It contained a price redetermination article, under which contract prices could be redetermined downward

---

1. Contract DA–11–022–ORD–2200, hereinafter referred to as Contract 2200, with amendments.

2. Contract DA–11–022–ORD–1216, referred to hereinafter as Contract 1216, with amendments.

only, but both prospectively and retroactively. Unlike Contracts 8292,[3] 297 and 983, Contract 1216 contained no repricing of subcontracts article and no provision with respect to passing through price refunds received by plaintiff from suppliers to defendant during the period when the prime contract price was fixed.

On July 3, 1953, defendant sent plaintiff an invitation to bid on 3,750 trucks, stating that only one producer of these trucks would remain in production after December 31, 1953, and that in determining which producer would be retained, "price would be the most important consideration."

Plaintiff submitted its bid proposal, which was accepted by the execution of Supplement 3 to Contract 1216 on September 11, 1953. Supplement 3 eliminated the retroactive, downward price redetermination in the original Contract 1216 and provided only prospective downward price redetermination. Like original Contract 1216, it contained no provision for repricing of subcontracts or "pass through" to defendant of any refunds received by plaintiff from subcontractors.

The crux of the Rockwell Issue results from the omission in Contract 1216, as amended, of these hitherto included contract provisions. Plaintiff contends that this omission establishes that defendant thereby waived any claim for refunds received by plaintiff from subcontractors arising from repricing of their subcontracts. Defendant contends that this provision for repricing of subcontracts was not included in Supplement 3 to Contract 1216 because in the earlier Contracts 297, 983 and 8292, plaintiff had advised the Chicago Ordnance District in July of 1952, that various subcontractors, including Timken, had objected to the inclusion of this clause in their subcontracts or purchase orders. Timken objected to such price

redetermination provision being included in purchase orders because it was already subject to price redetermination under its own Contract 11448 with defendant's Detroit Ordnance District. As to these earlier contracts, the Chicago Ordnance District then, in order to facilitate production, authorized plaintiff to place its orders for axle sets with Timken unconditionally on the basis that such orders would be repriced by the Detroit Ordnance District under its Contract 11448 with Timken.

During the negotiations leading to Supplement 3 to Contract 1216, plaintiff was again informed by defendant that Timken was subject to price redetermination under its Contract 11448 with the Detroit Ordnance District, which would continue to administer the contract and any price redetermination proceedings thereunder.

Prior to the merger of Timken with Standard Steel Spring Co. to form Rockwell Spring and Axle Company on October 1, 1953, no formal price redetermination proceedings had been held under Timken's Contract 11448 with defendant. However, Timken in order to divest itself of excess profits, had first issued credit memoranda to the prime contractors, and later made advance payments to the Renegotiation Board. These latter payments went into general receipts of the United States Treasury, and were not available to Ordnance for further procurement purposes. Standard however, under a similar contract, had followed instructions of the Detroit Ordnance District by making voluntary refunds, in anticipation of price redetermination proceedings, to its prime contractors, who in turn remitted said refunds to Army Ordnance, thereby "keeping the funds in the procurement stream" in the words of the Government.

On September 30, 1953, Rockwell[4] advised plaintiff that, in anticipation of

---

3. Contract 8292 was a much earlier contract between plaintiff and defendant. It was entered into December 4, 1950. It was quite similar to the later contracts (Contracts 297 and 983) between the parties.

4. Since we have now reached the date when Timken and Standard merged to form Rockwell, we will hereinafter refer to plaintiff's axle supplier as Rockwell.

formal price redetermination pursuant to its Contract 11448 with defendant, it was going to voluntarily make a refund of $1,845,338.09 applicable to Contracts 8292, 297 and 983. Rockwell explained that it had been directed by defendant to make such refunds to its prime contractors because Ordnance's receipt of the refund through the prime contractors would "keep the funds in the procurement stream" for further Ordnance procurement. Rockwell also advised plaintiff that this practice would be followed in *all future* refunds stemming from its Contract 11448 with defendant. This arrangement of passing refunds from Rockwell under its Contract 11448 through plaintiff to defendant was also insisted upon in a communication between the Detroit Ordnance District and plaintiff's counsel. It was further insisted by defendant that in all instances it would be the prime contractor's obligation to give the Government the benefit of the refund. Thereafter, plaintiff deposited Rockwell's check and issued a check to defendant for the same amount, $1,845,338.09.

On November 6, 1953, Rockwell in anticipation of formal redetermination by Detroit Ordnance under Contract 11448, made a refund of $371,207.09 to plaintiff applicable to Contracts 297, 983, 8292 and also to 8841, a fixed price spare parts contract which had no price redetermination or repricing of subcontracts provision. The amount of the Rockwell refund on this last contract was $35.09. Plaintiff paid $371,172.00 of the refund to defendant, and retained $35.09. This is the $35.09 item in defendant's second counterclaim.[5]

On February 17, 1954, Rockwell sent a refund of $217,676.69 to plaintiff in anticipation of formal price redetermination under its Contract 11448 with the Detroit Ordnance District. Of the total amount, $167,870.48 was applicable to Contracts 297 and 983, and plaintiff thereafter paid this amount to defendant. The remaining amount of $49,806.21 could be broken down as follows: $31,587.40 applicable to Contract 1216, and $18,218.81 applicable to eleven fixed price spare parts contracts (inclusive of Contract 8841). Plaintiff retained this amount of $49,806.21. Thereafter, upon demand for payment by defendant, plaintiff paid $25,000 to the Chicago Ordnance District. (In its third counterclaim, defendant claims the difference between the $49,806.21 and $25,000, i. e., $24,806.21).

Prior to February 15, 1955 Rockwell advised plaintiff of an intended refund of $1,529,737.90 applicable to Contract 1216 for the fiscal year 1954. Plaintiff advised Rockwell that it intended to retain this refund and not pass it on to defendant, as previously done under the prior contracts. At plaintiff's insistence, the credit memorandum accompanying the payment of $1,529,737.90 was revised to describe the refund as a revision of Rockwell's price to plaintiff instead of a "voluntary price adjustment," and to list all the axle sets with original and lower revised prices, with the difference totaling the amount of the refund. The original notation "voluntary price adjustment for the fiscal year ended December 31, 1954 * * *," on the credit memorandum was revised to state, "To revise set price on Contract Number DA–11–22–ORD–1216. Shipped during the year ended December 31, 1954." Plaintiff retained the full amount of the Rockwell refund of $1,529,737.90.

On March 9, 1955, as a result of prior repricing negotiations under Contract 11448, Rockwell and the Detroit Ordnance District entered into Supplemental Agreement No. 2. Listed upon a schedule attached thereto entitled "Refunds Made to Customers," was the refund made to plaintiff in the amount of $1,845,338.09 as allocated and applicable to purchases by plaintiff under prime Contracts 8292, 297 and 983.

5. Defendant's second and third counterclaims, along with an offset are being determined in this issue. Defendant's first and fourth counterclaims will be examined in conjunction with the Price Redetermination Issue.

By letter dated March 25, 1955, to the Detroit Ordnance District, Rockwell submitted a statement of sales, costs of sales and profits for the year ended December 31, 1954, covering axle sets and spare parts subject to price redetermination under Contract 11448. The letter in part read as follows:

"Price adjustments were made with the International Harvester Company for the fiscal year ended December 31, 1954, totaling $1,529,737.90, which price adjustments have been given effect in the statements enclosed. These were the only price adjustments during the year."

As a result of prior negotiations, on October 21, 1955, Rockwell and Detroit Ordnance District entered into Supplemental Agreement No. 3 to Contract 11448. Listed upon a schedule thereto entitled "Refunds to Customers" was the refund made to plaintiff in the amount of $371,207.09 as allocated and applicable to purchases by plaintiff under prime Contracts 8292, 297, 983 and 8841. The agreement further stated that this amount of $371,207.09 was part of the total amount which represented the result of the agreed revision of prices pursuant to Contract 11448.

As a result of prior negotiations, on December 13, 1955, Rockwell and the Detroit Ordnance District entered into Supplemental Agreement No. 4 to Contract 11448. Listed upon schedules similar to those in previous supplements was the refund made to plaintiff in the amount of $217,676.69 as allocated and applicable to purchases by plaintiff under prime Contracts 297, 983, 1216 and the eleven additional spare parts contracts. The agreement further stated that this amount of $217,676.69 was part of the total amount which represented the results of the agreed revision of prices pursuant to Contract 11448.

Having been furnished by Detroit Ordnance District with copies of the aforementioned Supplemental Agreements Nos. 2, 3 and 4, Chicago Ordnance District could not reconcile the amounts listed therein as having been refunded to plaintiff with the amounts that had been refunded by plaintiff to it. Upon request, Detroit Ordnance forwarded a tabulation to the Chicago District showing the refunds made by Rockwell to its prime contractors through December 31, 1953, and also notified the Chicago District that Rockwell "has advised this office that it has made a refund direct to International Harvester Company of $1,529,737.90 'on Contract 1216' for the calendar year * * *." Thereupon, in a letter dated April 12, 1956, the Chicago Ordnance District requested plaintiff to "pass this refund" of $1,529,737.90 "on to this District, as you have in the past." By letter of April 20, 1956, plaintiff refused to pass on said refund to defendant because " * * * the subcontract price revision affects deliveries and costs during periods as to which the prime contract is firm and not subject to price revision."

As a result of prior negotiations, on June 1, 1956, Rockwell and the Detroit Ordnance District entered into Supplemental Agreement No. 5 to Contract 11448. The agreement recited, among other things, that for the fiscal year ended December 31, 1954, Rockwell had "refunded to one of the Government prime contractors, namely, International Harvester Company, under Contract DA–11–022–ORD–1216, the sum of $1,529,737.90 * * *." Listed upon attached schedules captioned "Refunds to Customers" was the refund made to plaintiff on Contract 1216 in the sum of $1,529,737.90. The agreement further stated that this amount of $1,529,737.90 was part of the total amount which represented the results of the agreed revision of prices pursuant to Contract 11448 between Rockwell and defendant.

Further requests for payment were made upon plaintiff. Finally, by letter dated January 23, 1957, plaintiff was notified it was indebted to defendant for the sum of $1,529,737.90 under Contract 1216, "representing the amount paid over to you by Rockwell Spring & Axle Company for and inuring to the benefit of the Government, relating to axles sup-

plied by it for performance of the contract, in accordance with repricing agreement existing between the Government and 'Rockwell'." Upon plaintiff's refusal to pay, said amount of $1,529,737.90 was deducted from amounts otherwise due to plaintiff on Contract 2200 entered into with defendant.

Upon analysis of the foregoing facts we have decided that all cash refunds made to plaintiff by Rockwell were made for the benefit of defendant pursuant to Rockwell's obligations under its price redetermination contract with defendant. The funds were expressly delivered in trust to plaintiff for the use of defendant. When the funds were wrongfully diverted and retained by plaintiff, defendant was entitled to a setoff of $1,529,737.90 which we now affirm, and is presently entitled to judgment on its two counterclaims in the amounts of $35.09 and $24,806.21.

The express practice of operating the price adjustments and voluntary refunds in the aforementioned manner was begun on September 30, 1953, when plaintiff was informed by Rockwell that in anticipation of formal price redetermination pursuant to Rockwell's Contract 11448 with defendant, Rockwell was going to refund $1,845,338.09 applicable to Contracts 8292, 297 and 983 to plaintiff. Plaintiff was thereafter advised that such refunds were being made directly to prime contractors (rather than defendant) in order to keep the funds in the procurement stream, and thereby available to Army Ordnance for further procurement purposes. Plaintiff was also advised that Rockwell intended to make *all* refunds stemming from its Contract 11448 with Detroit Ordnance District in the same manner. Thereafter, plaintiff *was informed by Detroit Ordnance District* that said District insisted that the refund would have to be made through the prime contractor to the Government, and that in *all* instances, it would be the prime contractor's obligation to give the Government the benefit of the refund. Plaintiff, therefore, fully cognizant of the conditions, circumstances and terms of the refund, accepted this initial refund of $1,845,338.09 and passed said sum on to defendant.

Under these factual circumstances, it is clear that Rockwell had created an express trust pursuant to which plaintiff was obligated to pass through intact *all* Rockwell refunds stemming from Rockwell's obligations under Contract 11448 to defendant in order to keep these monies in the procurement stream. An express trust is created where the settlor properly manifests an intention to create a trust. Scott, Trusts, § 23 (1939 ed.) However, neither a particular or technical form of words, written or oral, nor a particular form of conduct is necessary in order to manifest the intention to create the trust. There is sufficient manifestation if there is reasonable certainty as to the property, the objects and the beneficiaries. Colton v. Colton, 127 U.S. 300, 310, 8 S.Ct. 1164, 32 L.Ed. 138 (1888); Chicago, Milwaukee & St. Paul Railway Co. et al. v. Des Moines Union Railway Co. et al., 254 U.S. 196, 208, 41 S.Ct. 81, 65 L.Ed. 219 (1920); Mahaffey v. Helvering, 140 F.2d 879, 882 (8th Cir. 1944); Edgerton v. Johnson, 178 F.2d 106, 110–111 (7th Cir. 1949); Scott, Trusts, § 24 (1939 ed.) Accordingly, when plaintiff agreed to the above-mentioned terms of the refund, and then accepted the payment, and turned the payment over to defendant, a trust had been established. Rockwell was the settlor who had created a trust vesting title in plaintiff, as trustee. The equitable title to all such refunds belonged to defendant as *cestui que trust*.

Having accepted the trust, plaintiff was required to effectuate its objectives, and, because of the fiduciary relationship, was bound to abstain from doing anything inconsistent with the duty or trust imposed upon it by such relationship. As was stated by Chief Judge Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1 (1928):

> " * * * Many forms of conduct permissible in a workaday world for those acting at arm's length,

are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. * * * Only thus has the level of conduct for fiduciaries been kept a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

Plaintiff alleges that it is entitled to the Rockwell refunds in issue because the contracts to which they were applicable either had no repricing of subcontracts article (i. e., Supplement 3 to Contract 1216), or had no price redetermination provisions and no repricing of subcontracts article (i. e., the eleven fixed price spare parts contracts).

These arguments are untenable. As reported in Finding 34, a repricing of subcontracts or purchase orders article was not included in Supplement 3 to Contract 1216 between plaintiff and defendant because, for one reason, Rockwell had in the past objected to the inclusion of such a clause in plaintiff's purchase orders. Plaintiff knew the objection was made because Rockwell was subject to price redetermination pursuant to Contract 11448 with Detroit Ordnance. When the refunds on Contract 1216 were turned over to plaintiff, plaintiff was well aware that they were made because of the price redetermination clause of Rockwell's Contract 11448, and that Rockwell expected plaintiff to turn them over to the Government. Plaintiff was aware of the same factual situation with regard to the refund applicable to the fixed price spare parts contracts. For plaintiff to divert this money, knowing full well why it was being paid to it (as trustee) and for what purpose (for the benefit of defendant), was a clear violation of the terms of the trust. Plaintiff violated the terms of the trust by diverting and retaining the sums of $35.09, $24,806.21 and $1,529,737.90.

Plaintiff's further contention that Rockwell did not intend the refund of $1,529,737.90 under Contract 1216 to be turned over to the Government as part of Rockwell's contractual obligations with the Government, but instead, intended it to constitute a routine axle price adjustment under plaintiff's and Rockwell's own subcontract arrangements, is also without foundation. The proof shows without doubt that Rockwell considered this payment to be exactly like the others, and to be made for the same purpose. It is true that after Rockwell made this particular payment in the same manner it had adopted in making the other similar payments to plaintiff, Rockwell and plaintiff (at plaintiff's urging) held a special meeting and revised the papers to make it appear as if the payment represented a routine axle price adjustment on the subcontract, instead of a payment pursuant to Rockwell's contractual arrangements with defendant. Rockwell knew full well why plaintiff wanted the usual procedure to be changed and the papers revised and, despite its clear obligation of trust with defendant, chose to cooperate with plaintiff. Its explanation at the trial was that it knew plaintiff was planning to retain the funds, but it nevertheless felt what had happened to the money was essentially a matter between plaintiff and defendant, and not its concern. This form of connivance and violation of trust by the prime contractor and the subcontractor cannot be allowed to becloud the true nature of the payment or to deprive the Government of funds rightfully belonging to it. That Rockwell itself never had any real doubt as to such true nature is evidenced by the fact that in its direct dealings with the Government, it subsequently reported the payment to the Government as having been made to plaintiff pursuant to its own contractual obligations to the Government, and in accordance with the Government's previous directions under the agreed arrangements, and in the same way as its previous payments. Thus, despite the different forms it ultimately employed

at plaintiff's request, it clearly regarded this payment to plaintiff the same as the others it had made to plaintiff, i e., for turning over to the Government.

Defendant, as equitable owner of all the aforementioned payments made to plaintiff by Rockwell for defendant's benefit was justified in offsetting the amount wrongfully retained by plaintiff in the sum of $1,529,737.90. Further, defendant is entitled to prevail in its two counterclaims for further sums wrongfully retained by plaintiff in the respective sums of $35.09 and $24,806.21.

### THE FEDERAL EXCISE TAX ISSUE

▪ Pursuant to the excise tax provisions of the Internal Revenue Code then in effect, plaintiff, in submitting bid proposals on military vehicles, computed an excise tax on the body and chassis of 8 percent of the bid price on each model exclusive of the cost of tires and minor accessory items. The body and chassis excise tax was included in the bid proposals and the resulting contract prices. The net result of operating in this manner meant that plaintiff would initially pay the excise tax and then be reimbursed the amount of the tax by defendant through the contract price.

When plaintiff submitted its bid proposal to defendant on July 24, 1953, for the aforementioned 3,750 vehicles to be included in Contract 1216 it included in its cost breakdown an amount representing 8 percent Federal excise tax on the body and chassis of each model. Three days later on July 27, plaintiff advised defendant by letter that, based upon a ruling by the Bureau of Internal Revenue that the body and chassis of 2½ ton M–108 military vehicles were not subject to Federal excise taxes, the proposal of July 24 should be amended by deleting the chassis and body excise tax on the

475 M–62 vehicles included in that proposal. Plaintiff thereafter requested a specific ruling from the Bureau of Internal Revenue on the M–62 vehicles. The Bureau's reply to plaintiff by telegram of August 17 stated that the M–62's were ruled to be "off-the-highway" vehicles and not subject to excise tax under section 3403(a), as amended, of the Internal Revenue Code of 1939, 26 U.S.C. § 3403(a) (1952 ed.)

Plaintiff submitted a revised proposal on the 3,750 vehicles on August 26, 1953. Attached to the proposal were cost breakdowns for each model of vehicle, which breakdowns included an 8 percent excise tax on all vehicles including the M–62. This tax was included by plaintiff despite the July 27th letter to defendant, and despite the ruling of the Bureau of Internal Revenue by telegram of August 17. On September 11, 1953, Supplement No. 3 to Contract 1216, covering the production of the 3,750 vehicles, was executed at the prices bid by plaintiff, including the Federal excise taxes.

On December 22, 1953, plaintiff wrote to the Bureau of Internal Revenue, and requested an "off-the-highway" classification (body and chassis excise tax exemption rating) on various model numbers, including all those in Contract 1216. Plaintiff received a reply on January 29, 1954. In that reply, plaintiff was informed that the various vehicles were not subject to the body and chassis tax. As a result of the ruling by the Bureau of Internal Revenue, no excise tax was paid by plaintiff on the chassis or body of any vehicle under Contract 1216. At no time after receipt of either of the rulings did plaintiff inform defendant that the vehicles being manufactured under Contract 1216 were not subject to the body and chassis excise tax.[6]

6. In January of 1954, defendant did request an explanation from plaintiff as to the reason for the inclusion of the excise tax on the M–62's. Plaintiff informed defendant that a ruling on all models under Contract 1216 had not yet been received from the Bureau of Internal Revenue. The Commissioner found that plaintiff had presumably forgotten about the specific ruling received on the M–62 when it made this statement.

The dispute between the parties concerns the body and chassis excise taxes in the sum of $249,919.47. Defendant contends that since plaintiff was relieved from paying the excise taxes by virtue of the aforementioned rulings of the Bureau, and since the sum of the taxes was included in the contract price, plaintiff was, by the terms of the contract, obliged to refund said sum to defendant.[7] Plaintiff does not dispute the fact that any amount of tax included in the contract price must be refunded to defendant. In fact, plaintiff has refunded over $2½ million to defendant for taxes plaintiff was relieved from paying under Contract 1216, said taxes being included in the contract price. However, plaintiff contends that the sum of money in issue here ($249,919.47) was not in fact included in the contract price as excise taxes, but was part of the cost of the materials.

Plaintiff uses the changes article[8] of the contract as a basis for its conten-

---

7. See Finding 76, which reads:
"Article 2, paragraph 10 of Contract 1216, provided in pertinent part:
"10. FEDERAL, STATE, AND LOCAL TAXES
\* \* \* \* \*
"(b) *Federal Taxes.* Except as may be otherwise provided in this contract, the contract price includes all applicable Federal taxes in effect on the contract date.
\* \* \* \* \*
"(e) *Price Adjustment.* If, after the contract date, the Federal Government or any State or local government either (i) imposes or increases (or removes an exemption with respect to) any direct tax, or any tax directly applicable to the materials or components used in the manufacture or furnishing of the completed supplies or services covered by this contract, or (ii) refuses to accept the evidence of exemption, furnished under paragraph (d) hereof, with respect to any direct tax excluded from the contract price, and if under either (i) or (ii) the Contractor is obliged to and does pay or bear the burden of any such tax, and does not secure a refund thereof), the contract price shall be correspondingly increased. If, after the contract date, the Contractor is relieved in whole or in part from the payment or the burden of any direct tax included in the contract price, or any tax directly applicable to the materials or components used in the manufacture or furnishing of the completed supplies or services covered by this contract, the Contractor agrees promptly to notify the Contracting Officer of such relief, and the contract price shall be correspondingly decreased or the amount of such relief paid over to the Government. Invoices or vouchers covering any increase or decrease in contract price pursuant to the provisions of this paragraph shall state the amount thereof, as a separate added or deducted item, and shall identify the particular tax imposed, increased, eliminated, or decreased."

8. Paragraph 10 of Supplement 3 to Contract 1216 provided:
"10. The provisions of this paragraph shall be applicable only to Items 5 through 19 of paragraph (a) of Article 1 of the Contract as amended.
"*Changes.* The Contracting Officer may at any time, by a written order, and without notice to the sureties make changes of any one or more of the following types: (a) changes in the directions as to shipment and packing of any supplies; (b) increases in the quantity of supplies to be furnished hereunder, the total increase not, however, to exceed a quantity of 1000 vehicles; (c) changes in the drawings or specifications, where the supplies to be furnished are to be specifically manufactured in accordance with drawings and specifications; \* \* \*
"If such changes cause an increase or decrease in the amount of work under this contract or in the cost of performance of this contract or in the time required for its performance an equitable adjustment shall be made which adjustment may include in any instance an adjustment (i) in the purchase price, including (but not limited to) any adjustment in unit price fair in the light of any change in volume caused by such order, and (ii) in the delivery time of schedule, or (iii) in either the price or delivery schedule and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 30 days from the date the change is ordered, provided, however, that the Contracting Officer, if he determines that the facts justify such action, may receive, consider and adjust any such claims asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in paragraph 12 of General Provisions entitled "Disputes" hereof. But nothing

tion. By letter of March 25, 1954, the Chicago Ordnance District requested plaintiff to furnish cost estimates involving proposed contract changes. One of the changes consisted of deleting 323 Model M–51 trucks from the contract, and replacing them with 323 additional Model M–54 trucks. As was previously stated, plaintiff's basic contract unit price included the 8 percent excise tax. The new unit price that plaintiff submitted to defendant for the additional M–54's consisted of the old M–54 contract price, plus additions for winches and other items not called for in the original M–54 specifications.

Plaintiff had in effect merely added to the old price the price for additional components. However, in submitting a cost breakdown to defendant, plaintiff reallocated the 8 percent excise tax to the materials component. Plaintiff had determined to retain the amount of the former 8 percent body and chassis excise tax in the price by shifting it into the materials component in an attempt to mitigate the effect of the very close prices it had contracted for on the vehicles covered by Contract 1216.

On April 15, 1954, plaintiff was requested to make cost estimates for other proposed changes. One of these changes consisted of adding 6 Model XM–246 tractor-wrecker trucks, but without fire extinguishers, to the contract. Plaintiff took the old price and made changes for the fire extinguishers in figuring the new price. Plaintiff also, as before, in submitting a cost breakdown, reallocated the amount of the 8 percent excise tax to the materials component.

On January 5, 1955, defendant requested another cost breakdown for further proposed changes. This change consisted of substituting fifteen M–55 vehicles for fifteen M–54's. Plaintiff again reallocated the amount of the excise tax included in the old price into the materials component of the new price.

All of the above changes were incorporated into the contract at the revised prices quoted by plaintiff.[9] By letter of January 23, 1957, the contracting officer on Contract 1216 demanded payment of the amount of the body and chassis tax which defendant claimed plaintiff owed. The letter stated that plaintiff was indebted to defendant on this matter since the tax was "included in the contract price, paid to you for Federal excise tax, which you were relieved from paying and did not pay to the Director of Internal Revenue." Plaintiff made payment on all items except the aforementioned changes. Defendant thereafter withheld the amount of $250,637.30 from payments due under another contract. Defendant has conceded that the withholding was excessive to the extent of $717.83, so that the amount presently in issue between the parties on account of the three above-mentioned excise tax items is $249,919.47.

Plaintiff states that when it made the cost breakdown of the trucks involved here the chassis and body excise tax was deleted from the bid price and reallocated to the cost of direct material. Plaintiff believes that in light of this, it is immaterial that defendant can trace the original tax amounts into the new contract prices; that the key issue is how the total price was finally allocated under the change orders. Plaintiff further contends that the Change Form Questionnaire in which the cost breakdown was made, was obviously intended to be used as a request for equitable adjustment under the changes article. Therefore, the contracting officer, when he accepted the bid as shown on this form, accepted its terms with any resulting changes in price, and may not thereafter repudiate the acceptance.

provided in this paragraph shall excuse the Contractor from proceeding with the Contract as changed."

9. The formal change order pertaining to the six XM–246 vehicles designated these vehicles as M–246's. This was merely a change in nomenclature, however, and as we have stated, the change consisted of merely adding six more of these vehicles to the total to be manufactured.

Defendant, on the other hand, insists that the reallocation of the body and chassis excise tax to the materials component on the Change Form Questionnaire did not remove the tax from the prices. Defendant admits that the Change Form Questionnaire was used to make a claim for an equitable adjustment. However, defendant contends that a contractor has no right to adjust the price for an increase in costs not directly attributable to the structural changes ordered.

After close consideration of these questions, we have decided that defendant's contentions are the more realistic ones, and are in accord with existing law. Plaintiff readily admits a reallocation of the tax amount to the materials component. Such a reallocation was made because plaintiff was losing money on the contract due to its extremely low contract bid. As will be explained in examination of the Price Redetermination Issue, plaintiff had deliberately bid on the contract at a price on which it was almost certain to incur a loss. When the aforementioned changes were made, plaintiff attempted to minimize this loss by the reallocation of the tax funds to the materials component. While we can understand plaintiff's predicament, we cannot condone its consequent actions. The very purpose of the inclusion of the changes clause in the contract was to reimburse a party for an increase or decrease in costs or to adjust the delivery schedule *as a direct result of such change*. The changes clause itself states this fact:

\* \* \* \* \* \*

"If such changes *cause* an increase or decrease in the amount of work under this contract or in the time required for its performance an equitable adjustment shall be made \* \* \*." [Emphasis supplied.]

The changes involved here consisted of substitutions of certain models of vehicles for others, with perhaps minor variances. All plaintiff needed to do in filling in the Change Form Questionnaire was to substitute the previous costs for the added models in place of the deleted models and then make adjustments for the minor variances. In breaking down the total cost there was no basis, *as a result of the change*, for increasing the materials component cost, except to minimize a prior planned loss. Since this increase in the materials component cost was not caused by the changes ordered, but was merely a funneling of the tax funds in order to avoid repayment of these funds to defendant, we hold that the changed contract price included the excise chassis and body taxes, and that defendant was entitled to withhold these sums from amounts due on other contracts with plaintiff.

Plaintiff has raised the point that defendant, by its action in accepting the changes as plaintiff set them out, was estopped from offsetting the sum in controversy at a later date. It is well established law, however, that when payments like these are erroneously made, it is not only lawful but the duty of the Government to recover the payments. Cf. Fansteel Metallurgical Corporation v. United States, 172 F.Supp. 268, 145 Ct.Cl. 496 (1959) and cases cited therein. As we previously mentioned. defendant has conceded that the offset involved here was excessive to the extent of $717.-83. Plaintiff is therefore entitled to judgment on this amount.

## THE PRICE REDETERMINATION ISSUE

As we mentioned in discussing the Rockwell Issue, defendant sent plaintiff an invitation to bid on 3,750 more trucks on July 3, 1953. Defendant informed plaintiff that only one producer of these trucks would remain in production after December 31, 1953, and that in determining which producer would be retained, "price would be the most important consideration."

Plaintiff was exceedingly anxious to become defendant's sole supplier of the trucks. To this end, it determined to make every effort to obtain the proposed new contract, even to the extent of sustaining a loss on this particular pro-

curement. To enable it to submit as low a bid as possible, plaintiff determined to make every effort to obtain from its suppliers their lowest prices. Shortly thereafter, and after assembling the necessary data, including its subcontractor's quotations, plaintiff commenced the preparation of its bid.

In preparing its cost statement for bid purposes on these military vehicles, plaintiff customarily calculated the cost of each truck model on a basis of its carrying its full share of plaintiff's indirect and overhead costs in addition to the estimated materials costs, upon which it had received quotations, and the direct labor costs, the rates of which were known. These indirect and overhead costs had, through experience over the years, been calculated on various percentage bases. Such costs of a vehicle, so calculated, would be considered as bearing the vehicle's full share of plaintiff's total costs of manufacturing it, and would be termed as the "fully adjusted costs." Such fully adjusted costs, plus plaintiff's customary profit markup of eight percent, was the normal basis on which plaintiff calculated its prices for these military vehicles.

The usual procedure as described above was followed in initially preparing the cost data for plaintiff's bid on the proposed 3,750 vehicle contract. The proposed prices were calculated on a fully adjusted cost basis, and were composed of direct materials and labor plus a proportionate share of all overhead and indirect costs, such as direct overhead, material adjustments, the general and administrative expenses, plus eight percent profit.

Upon review of this cost data, plaintiff concluded that a bid based upon its fully adjusted costs plus eight percent profit would, in all probability, not be successful. Thereupon, plaintiff's officials made a second calculation of the proposed prices per vehicle on a so-called "specific cost" or "out-of-pocket" basis, a basis plaintiff sometimes used in developing bids in special competitive situations. On this basis certain of the indirect and overhead costs which plaintiff customarily included in developing its fully adjusted costs were either eliminated or reduced. By this method, the proposed unit bid price of an M–51 vehicle, for example, was reduced from a fully adjusted cost of $12,552.82 to $11,349.67 on a specific or out-of-pocket cost basis.

On July 24, 1953, plaintiff submitted its bid proposal on the 3,750 vehicles. Accompanying the proposal was a schedule showing the unit price of each type of vehicle, and an estimated unit cost breakdown as to each type. This schedule which showed the bid price of each type of vehicle sets forth prices which were exactly equal to the prices developed on the above described specific cost or out-of-pocket cost basis. However, in breaking down the components of such price on a material, labor, overhead and profit basis, plaintiff showed amounts for such components in the data submitted with its bid which differed substantially from those previously and privately computed theretofor on the specific or out-of-pocket basis. Instead of building up to a price by the normal method of first calculating materials and labor costs, and then adding thereto overhead and profit rates on certain percentage bases (in this case, on less than the usual bases), plaintiff started with the price so previously built upon the specific cost basis, and then first carved out of this price the higher profit and overhead rates it normally used on a fully adjusted cost basis. This left a smaller and inaccurate balance for labor and materials. Then, by retaining the accurate amount for the labor component, the materials component was made to bear the brunt of the overstatements on the profit and overhead items, resulting in an amount for the materials component which was far less than the total quotations for materials from its suppliers as shown on its worksheets. For example, on one of the seven vehicle models, the M–52, the total unit price privately calculated by plaintiff on the specific cost basis was $10,147.60. Of this amount,

$8,427.55 had been first privately computed as the estimated cost of "direct material," on the basis of the total amount actually quoted by plaintiff's materials suppliers. In the bid data submitted to defendant, however, this "material" item was set forth at $8,032.72, a fictitious amount not supported by any normal accounting methods.

The conclusion is reasonable that in submitting its bid on an expected loss basis in order to become defendant's sole supplier of these vehicles on future procurement, plaintiff thus reconstructed the prices in its bid data because it felt that setting the components forth in the above described manner would be favorable to it in the event of further price redetermination proceedings. For example, the failure to make its purported eight percent profit would necessarily be given serious consideration.

Shortly after the submission of its proposal on the 3,750 vehicles, plaintiff was advised that it was the low bidder. The parties then agreed that instead of entering into an entirely new contract, as originally contemplated, the 3,750 vehicles would be covered by a supplemental agreement to the already outstanding Contract 1216. On September 11, 1953, plaintiff and Army Ordnance, acting by the Chicago Ordnance District, provided for the production of the 3,750 vehicles by an agreement which was designated as Supplemental Agreement No. 3 to Contract 1216.

In early September 1954 the Chicago Ordnance District, prior to making a decision whether to demand formal price redetermination under Contract 1216, decided to review plaintiff's costs on the contract in order to determine whether cost trends were upward or downward.[10]

The price analyst assigned by defendant to review the contract costs preliminary to a decision on price redetermination requested plaintiff to furnish the quotations which it had received from its suppliers for the major components of the vehicles, and upon which the bid and contract price of Contract 1216 were based, as well as plaintiff's actual current costs for such components. He also requested plaintiff's current overhead rates for comparison with the rates plaintiff utilized in its bid proposal. In addition, he asked for such figures as plaintiff could furnish which would indicate the total current cost of the individual vehicles.

Plaintiff informed the price analyst that the materials costs shown in the bid proposal were not based on quotations from suppliers, but instead, were based on a competitive bid basis, and no breakdown of that system was available. Plaintiff further informed the analyst that its cost system did not reflect individual vehicle costs and therefore that the total current cost of any of the models could not be determined. Plaintiff did submit to the price analyst, however, its burden rates and suppliers' invoices.

The analyst was not informed that plaintiff had in actuality obtained the actual materials quotations from suppliers as above mentioned. Nor was the analyst aware of the fact that plaintiff had computed its bid on a specific cost basis which included the full amount of such quotations but which eliminated or reduced overhead rates, adjustments and the profit percentage of eight percent. The price analyst was also not informed, and thus was unaware, that plaintiff had actually compiled figures showing the correct current total costs as of August 13, 1954, of the various models covered by Contract 1216. These figures showed plaintiff's current costs of producing each such model under Contract 1216, both on a fully adjusted and specific cost or out-of-pocket basis.

The price analyst, having no knowledge that the bid or contract prices of Con-

10. As will be remembered from the discussion of the Rockwell Issue, Supplement 3 of Contract 1216 contained a "downward and forward" only price redetermination provision to be made pursuant to written demand by either party, after which said parties would negotiate the proposed redetermination.

tract 1216 were calculated by plaintiff on the specific or out-of-pocket cost basis, observed that the current costs of Contract 1216 were higher than the contract or bid prices, and that plaintiff was therefore incurring a loss. The analyst reached this conclusion in the following manner:

1) Examining the suppliers' invoices in order to extract the major component costs;

2) Applying the burden or overhead rates given him by plaintiff to the component costs in order to determine the individual vehicle costs;

3) Comparing the individual vehicle costs arrived at in this manner with the individual vehicle costs on the contract or bid prices.

The analyst noted that although the trend of materials costs in performing Contract 1216, as compared to the materials costs of other contracts plaintiff was performing, was downward, the over-all current costs, considering the overhead plaintiff was experiencing, were higher than such costs as set forth in plaintiff's bid (which presumably reflected accurately plaintiff's overhead costs at the time of the submission thereof and the execution of Supplement 3). The analyst concluded that the trend of plaintiff's total cost was up, and that a price redetermination proceeding would not result in the establishment of lower contract prices. He therefore recommended that price redetermination proceedings not be instituted at that time.

Defendant contends in its first counterclaim [11] that had plaintiff accurately set forth the components making up the unit prices in its bid proposals on Contract 1216 so as to accurately reflect the amounts calculated on the specific cost basis (i e., with reduced overhead and profit figures, and with accurate materials figures, instead of setting them forth as it did with the larger overhead and profit and understated mate-

rials costs), or had plaintiff made such specific cost bid data available to defendant's price analyst, there would have been a forward and downward price redetermination, resulting in a contract price reduction in the amount of $490,-533.08, the amount now claimed by defendant in the first counterclaim.

Defendant, in effect, is contending that plaintiff by its above actions has breached the contract, and that the measure of damages should be the amount of the price reduction ($490,533.08) which would have resulted from a price redetermination. The question of breach and measure of damages, therefore, is contingent upon acceptance of the fact that had defendant been aware of all of the aspects of plaintiff's cost system, defendant would have demanded price redetermination negotiations which, in turn, would have resulted in a price reduction of $490,533.08.

This is a difficult question because here we have the unusual situation of being asked to reprice a contractor, who has already suffered a slight loss on a normal fully adjusted cost basis into a much greater loss. Normally, prices are redetermined so as to remove excess profits and to leave contractors with their normal profits, plus any additional profits they may prove they are entitled to as a result of special efforts or contributions, or unusual manufacturing economies, or the assumption of extraordinary risks, etc. The general theory is that a manufacturer should not make abnormal profits from the nation's war or defense effort. However, there are no abnormal or excessive profits involved in this case.

Under plaintiff's fully adjusted cost system, the system which accurately reflected the normal projection of costs and profits of Contract 1216, plaintiff would have suffered a loss as a result of its low bid. We have already determined that defendant is entitled to re-

---

11. Only defendant's first counterclaim will be considered in our discussion of this issue. Defendant's fourth counterclaim will not be examined, as it merely provides

for alternative sums of recovery in the event defendant does not prevail in either or both the Rockwell Issue or the Excise Tax Issue.

tain the sum of $1,529,737.90 on the 1955 Rockwell refund issue, and the sum of $249,919.47 on the excise tax issue. If defendant were also to prevail on its first counterclaim for $490,533.08 on the price redetermination issue, plaintiff's loss (on a fully adjusted cost basis) on Contract 1216 as supplemented would be $589,406.47. If plaintiff prevails, and defendant's first counterclaim is dismissed, plaintiff will still sustain a loss (on a fully adjusted cost basis) of $98,873.39 on this contract, after deducting the Rockwell refund and excise tax issues. Regardless of the fact that under a price redetermination on the specific or out-of-pocket cost basis which plaintiff used for its own purpose in actually computing the bid, plaintiff would show a profit, and regardless of the misrepresentations in the bid data as submitted, the out-of-pocket cost basis could not be used as an accurate or realistic method of price redetermination. For example, defendant accepted a profit component of eight percent in awarding the bid to plaintiff.

The price redetermination issue poses a further problem for the court. Under paragraph (b) of paragraph 7 of Supplement 3 to Contract 1216, prices were to be redetermined or revised by way of a *negotiation* between the parties. If we determine that there has been a breach of contract and that the measure of damages is the resulting price revision saving, it might be said that the court itself has conducted a redetermination proceeding. However, the record provides a solution for this difficulty.

Although defendant's price analyst testified that had he known of the true basis upon which plaintiff bid, he would have recommended price redetermination proceedings, we agree with the findings of the Trial Commissioner that it is not now possible to determine whether, had plaintiff set forth the bid showing the bid data in the form defendant considers proper, or had the analyst been given the data he asked for, or should have been furnished, a formal demand for price redetermination would have been

made. Similarly, the Trial Commissioner has found, and we agree, that had such price redetermination proceedings been initiated, it is not now possible to determine what would have been the future events (such as the 1955 Rockwell refund herein involved) the parties would have anticipated and considered in formulating prospective or "forward" cost estimates, whether the price redetermination supplement to the contract would have reserved any matters for future consideration, and what, if any, specific amount would have been determined as an appropriate price adjustment.

The Commissioner likewise found, and we concur, that in addition to considering prospective costs, arriving at predetermined prices including an appropriate profit amount involved a consideration of certain intangible factors, such as the risks assumed by the contractor, its efficiency, and its technical contribution to the defense effort.

Furthermore, the Commissioner has found, and we agree, that regardless of technical legality or power to so redetermine prices under the facts herein involved, and considering only the question of defendant's practice or policy, the record shows no instance in which prices were reduced in situations where profits on a fully adjusted basis were very low or non-existent, or where, to reduce them, would throw the contractor into a loss position on such cost basis.

The issue as to whether defendant would have requested a price redetermination under these circumstances arises from defendant's first counterclaim in the amount of $490,533.08, and the burden of proof on this issue is upon defendant. The crux of the matter is that defendant is required to prove that it would have requested or required negotiations for price redetermination had the actual basis upon which the bid was first computed been known. This requirement is not met by the testimony of defendant's price analyst that had he known the actual facts, he would have recommended price redetermination pro-

ceedings. Defendant's failure to meet this burden of proof leaves us to mere speculation as to whether or how much defendant was damaged by plaintiff's withholding information from defendant, and by its misrepresentations in the cost data submitted with its bid. Both at the time of the execution of Contract 1216 · and of Supplement 3, defendant's procurement officers were well aware of plaintiff's current materials costs and all other costs; on examining plaintiff's bid data, they must have been also aware that the unit materials cost breakdowns were clearly underestimated. Plaintiff's actions in this regard were clearly not above board, but this unsatisfactory conduct does not provide sufficient evidentiary basis to find for defendant on its counterclaim. Defendant's first counterclaim is accordingly dismissed due to defendant's failure to prove that it would have requested price redetermination proceedings, even if the bid and contract cost data, and other information had been submitted in the form that defendant contends was correct and proper, and that such proceedings would have led to the end result sought by the counterclaim.

Judgment should be entered as follows:

1. On the Rockwell payment claim of $1,529,737.90, the petition is dismissed.

2. On the excise tax claim, plaintiff is entitled to judgment in the amount of $717.83. The petition as to the balance of the claim in the amount of $249,-919.47 is dismissed.

3. The first counterclaim of $490,533.-08 is dismissed.

4. On the second counterclaim, defendant is entitled to judgment in the amount of $35.09.

5. On the third counterclaim, defendant is entitled to judgment in the amount of $24,806.21.

6. The fourth counterclaim is dismissed.

Accordingly, judgment is entered for defendant in the total amount of $24,-123.47.