**Milton BEATTY et al.**

v.

**UNITED STATES.**

Cong. No. 3–55.

United States Court of Claims.
Dec. 3, 1958.

John W. Bonner, Helena, Mont., for plaintiffs.

Howard O. Sigmond, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

WHITAKER, Judge.

This case is before the court on Senate Resolution 115, 84th Congress, 1st Session, referring to us plaintiffs' claims for a report thereon, giving findings of fact and stating our conclusions on whether or not plaintiffs have legal or equitable claims, and the amounts, if any, legally or equitably due from the United States.

The United States desired to purchase plaintiffs' property for the Canyon Ferry Reservoir in Montana, to be created by the erection of a dam on the Missouri River. Negotiations were entered into, with the result that plaintiffs voluntarily sold their property to the United States, and executed deeds therefor. Plaintiffs now allege, however, that false representations were made to them to induce the sale of their lands, and that they were forced to sell at the prices offered by defendant through fear and duress.

The false representation alleged consists of a statement that the same price per acre would be paid for each parcel of land purchased; whereas, it is alleged, the price paid per acre for the various parcels varied greatly.

It is also alleged that the plaintiffs believed that the Government would not be guilty of offering them less than the fair value of their property and that, therefore, they assumed that the prices offered were fair, and in reliance thereon sold at the prices offered.

The duress alleged is the statements said to have been made by the agents of the Bureau of Reclamation, representing the defendant, if plaintiffs did not sell their property at the price offered, that the property would be condemned, requiring plaintiffs to pay large lawyer's

fees, which would largely consume the amount paid for the property, and that it would require many years, perhaps as many as 25, before they would ever get their money. It is also alleged that the Government offered to lease back to grantors land voluntarily sold, but would not lease back lands which it had to condemn.

 Defendant denies the allegations of false representations and duress, and there is a conflict in the testimony as to the facts supporting the allegations, but, even if it be assumed that the facts alleged are true, it is apparent that plaintiffs have no legal or equitable claims against the United States. Plaintiffs were not minors nor mental incompetents, nor, indeed, untutored, simple men. They were intelligent, successful farmers and ranchers. They, better than anybody else, knew what their property was worth, and they, better than anybody else, knew whether the price offered by the Government was a fair price.

The fact that Government agents may have told them that the same price per acre would be paid for each comparable parcel purchased, if true, is not a misrepresentation of a material fact. What the plaintiffs were entitled to demand was the fair value of their property, and not the same price that their neighbor might be paid for his. If the Government happened to pay their neighbor more than his property was worth, that did not mean that the plaintiffs were entitled to demand the same price for their property. The plaintiffs were only entitled to demand the fair value of their own property.

It is conceded that the Government offered all the plaintiffs the appraised value of their properties, but plaintiffs say that the appraisals were not properly made and that their properties were not appraised at their fair value. The proof shows that the appraisers made an honest effort to properly appraise the various parcels; but whether the values arrived at were in fact the true values makes no difference. Plaintiffs were in the best position to know whether or not their property had been appraised at its fair value. If they did not think it had been, they were free to demand a higher price, and some of them did. Had they been minors or incompetents, the case would be different, but plaintiffs were intelligent, successful men, and must have known better than anyone the true present value of their lands. A number of them sold their properties only after consultation with their lawyers, although the majority did not do so. No effort was made to prevent them from consulting their lawyers or anyone else they chose to consult. So far as the evidence shows, no high-pressure tactics were used.

 It is true that plaintiffs say that they were told that if they did not sell their properties to the Government at the appraised price, they would be condemned, and that in that event they would have to pay lawyer's fees, which would eat up the amount awarded them, and that it would take many years, perhaps as many as 25, for them to get any money out of it. That they were told that, if they did not sell, their property would be condemned, was not duress. This was a mere statement of the inevitable consequence of their refusal to sell. It was a frank statement of an intention to seek a remedy which the law gave. It is never duress to institute or threaten to institute civil suits where the threat to do so is made in the honest belief that a good cause of action exists. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 1 Cir., 176 F.2d 799, affirmed 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312; Du Puy v. United States, 67 Ct.Cl. 348, certiorari denied 281 U.S. 739, 50 S.Ct. 346, 74 L.Ed. 1153; Moseley v. Owensboro Municipal Housing Comm., Ky., 252 S.W.2d 880; Roelvink v. City of Milwaukee, 273 Wis. 605, 79 N.W.2d 106.

 A party is always entitled to say that if his offer is not accepted, he will avail himself of his legal rights; it is only the threat of a wrongful or unlawful act that may constitute duress. Such a threat will amount to duress only if it is sufficient to overpower the will of

the other party and prevent the free exercise of his will. Such a situation is not presented to us. It is, of course, true that the plaintiffs would need a lawyer in case condemnation proceedings were instituted, but it is silly to say that the lawyer's fees would eat up any award that might be made; and it is equally absurd to say that it would take 25 years for them to ever get any money out of it. It is a reflection upon their intelligence to assert that they believed any such representations, if in fact they were made. If they were inclined to believe it, it was only necessary for them to consult their lawyers to learn that it was false. We cannot believe they were so gullible.

Now it does seem to be true that, for a few months after the defendant began acquiring these lands, it did give the grantors leases on the lands conveyed when they voluntarily conveyed them, but it did not give a lease to those whose property had to be condemned. (Later this policy was abandoned.) These leases were executed for a period up to the time that it was expected the property would be flooded, and were given at a low or perhaps a nominal rental. But whether or not such a lease should be executed was within the sole discretion of the Government. If the plaintiffs sold their property, the Government was entitled to do with it whatever it pleased. It could give the plaintiffs a lease or not, as it chose. It had the right to give a lease to those who voluntarily conveyed, and to withhold one from those whose property had to be condemned. It is not unnatural that the Government was more generous to those who voluntarily conveyed than to those who put the Government to the trouble of condemnation. Naturally, the Government wanted to save the time and expense and trouble of instituting condemnation proceedings, and it may well be that the Government used this argument to induce voluntary conveyances. It was for plaintiffs to decide whether or not they were willing to accept the Government's offer, coupled with a lease, or to reject it and take what they could get through condemnation proceedings, without a lease. They were completely free to do either one or the other; they have no right to complain of the choice they made.

We repeat: It is not duress for a party to do or threaten to do what it has a legal right to do.

Nor are we persuaded that the prices offered by the Government were substantially below the fair market value of the property *at the time of the sale*. The various properties were purchased over a period of some five years, and in that time there was great fluctuation in land values, due in part at least to the Korean War. The proof shows that the index of farm prices increased some 362 percent in the period during which these properties were being acquired. The result is that the Government did pay quite a good deal more for property acquired toward the end of the period of acquisitions than it had paid at the beginning. In all instances defendant undertook to pay landowners what it thought the current market value of their property was.

The period of acquisitions was spread over a long time because of a number of things, uncertainty as to the height of the dam to be erected, and, hence, the amount of property to be flooded, Congressional appropriations, etc. Much of the dissatisfaction has arisen from the fact that some landowners received more for their property than others, but this happened because of the increase in market value over the intervening years.

As an illustration of the fact that defendant paid a fair price for the properties purchased, we cite the instance of Mr. Hardgrove's property, one of the plaintiffs. Mr. Hardgrove owned a farm in Canton Valley, which was considered the richest farming area within the project. He was offered $159 an acre for the two tracts which he owned. One tract consisted of 60 acres, and the other of 38.9 acres. The 38.9 acres were appraised at $125 an acre. This was a part of a 320-acre tract of land which Mr. Hardgrove and his partner had bought from the Teague Estate in 1947, about two years prior to its sale to the Govern-

ment. For this 38.9 acres Hardgrove and his partner had paid $78.25 an acre. In the same year in which the property was sold to the Government, Hardgrove bought out his partner's interest in this 38.9 acres for $93.75 an acre. About six months later the Government paid him $125 an acre. Mr. Hardgrove signed the deed after consultation with his lawyer and in his lawyer's office.

The sale by Mr. Hardgrove is referred to because Mr. Hardgrove was one of the leading men in the community and had been instrumental in calling a meeting of the property owners to confer with Government agents relative to the sale of their properties.

We do not mean to say that the facts in his case exist in all other cases. Indeed, some of the other landowners in the reservoir area, who refused to execute deeds voluntarily, got considerably more as the result of condemnation proceedings than had been offered them. But whether or not this is so, the recitation of the Government's dealing with Mr. Hardgrove shows that the Government agents were undertaking to deal fairly with the landowners, and their action in his case is by no means exceptional. We are convinced that in all cases they at least tried to act fairly.

The commissioner of this court has dealt in detail with each claim, and makes an ultimate finding in finding 139. In this finding he says:

"Defendant paid the fair market value at the time of sale for the various properties bought from plaintiffs. Prices paid were also comparable as between plaintiffs to the extent of sales made at or about the same time for similar lands. Plaintiffs were offered the full appraised price set after appraisal by qualified agents of defendant. * * * "

He also finds that there was no misrepresentation of material facts, and that the parties executing deeds were not acting under duress. We think the facts found in his report and the evidence introduced fully support these conclusions. We agree with and have adopted his findings, including his ultimate finding.

We conclude, therefore, that plaintiffs are not entitled to recover either at law or in equity. Whether or not anything should be paid them as a gratuity rests, of course, within the sole discretion of Congress.

This opinion, together with the findings of fact, which follow, will be certified to the Congress pursuant to Senate Resolution 115, 84th Congress, 1st Session.

JONES, Chief Judge, McLAUGHLIN, District Judge (sitting by designation), and MADDEN, Judge, concur.