**Judith F. CARPENTER, Executrix of the Estate of Ronald d'A. Carpenter**

v.

**The UNITED STATES.**

**No. 691–81T.**

United States Claims Court.

March 14, 1984.

Johannes R. Krahmer, Wilmington, Del., for Carpenter; Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., of counsel.

Allan C. Lewis, with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

In 1970, plaintiff [1] executed a trust document wherein he transferred to a trust his remainder interest in his mother's 1927 trust. The Internal Revenue Service (IRS) assessed a gift tax on this transfer on the ground that plaintiff's execution of the

---

1. The petition (complaint) was filed in this case on November 27, 1981, by plaintiff Ronald d'A. Carpenter. He died on December 26, 1982, and his widow and executrix, Judith F. Carpenter, was properly substituted as party plaintiff on April 18, 1983. For convenience, the term plaintiff will hereinafter refer to Ronald d'A. Carpenter.

trust document constituted a gift to the 1970 trust of his remainder interest under I.R.C. § 2501(a)(1) (Supp. V 1969). Plaintiff paid the tax assessment and sues here for a refund of $142,979.25, plus interest.

Plaintiff maintains that his execution of the trust instrument did not constitute a gift of his remainder interest for three reasons. These reasons, which have been translated into issues, are as follows: First, plaintiff claims that the 1970 trust was not effective until the death of his mother in 1976 because the trust instrument was not delivered to the trustee until that date. Second, plaintiff argues that the 1970 trust was invalid since it was executed by him only because of duress, coercion, and undue influence by his mother and her attorney. Third, plaintiff contends that the 1970 trust was invalid because plaintiff did not read or understand the terms of the trust at the time of execution, and he, therefore, lacked the necessary intent to create a trust at that time.

Both parties have moved for summary judgment on the first issue. Plaintiff maintains that since the trust instrument was not delivered to the trustee until his mother's death in 1976, as a matter of law, there could be no conveyance in 1970, of plaintiff's remainder interest in his mother's 1927 trust. Defendant contends, however, that since the trust instrument was delivered in 1970 to a third party with instructions to deliver it to the trustee on his mother's death, this constituted constructive delivery to the trustee in 1970 as a matter of law. Therefore, defendant argues that the trust was validly created in 1970 and that the transfer to the trust by plaintiff of his remainder interest constituted a gift to the trust at the time the trust instrument was executed in 1970.

Defendant has also moved for summary judgment on the second and third issues. Defendant argues that, as a matter of law, there was no duress, coercion or undue in-

fluence by plaintiff's mother or her attorney since the basis for this contention is merely plaintiff's fear of disinheritance or discontinuance of financial support if he did not execute the trust instrument. Defendant further argues that given the circumstances surrounding the execution of the 1970 trust, and plaintiff's maturity, experience and education, his failure to read and/or understand the trust document did not invalidate the 1970 trust as a matter of law. Plaintiff opposes defendant's motion on these two issues claiming that genuine issues of material fact remain to be resolved relative thereto.[2]

Upon consideration of the briefs of the parties, and after oral argument, it is concluded that plaintiff's delivery of the trust instrument constituted constructive delivery to the trustee as a matter of law. It is also concluded, as a matter of law, that the factors relied on by plaintiff do not constitute coercion, duress or undue influence sufficient to invalidate the trust, nor does plaintiff's alleged failure to read and/or understand the terms of the trust, under circumstances which existed at the time, suffice to invalidate the trust.

## I.

Plaintiff was one of three adopted children of a wealthy family. Plaintiff's mother, Louisa d'A. Carpenter, had established a 1927 trust wherein her three adopted children, or their surviving issue, were to receive equal shares of the trust corpus on the death of the mother. As of April 10, 1970, the IRS estimated the value of this 1927 trust to be approximately $5,154,286.

As of April 10, 1970, plaintiff was 35 years of age. He had received a degree from a business college. He and his wife Jeanne had two children. While he worked for short periods of time at various jobs, *e.g.*, stock salesman for a brokerage firm, real estate salesman, Tastee Freeze ice cream business, retail seafood business,

---

**2.** Both parties agree that a disputed issue exists as to the value of the remainder interest placed in trust by the 1970 instrument. Accordingly, further proceedings will be necessary, in any event, to resolve this issue unless the parties can reach agreement thereon and thereby preclude the need to litigate further.

bowling lane business, he and his family were, in essence, supported by his mother. His mother provided him with income, occasionally paid off his debts, and even bought a bowling business for him to operate. His mother also provided like financial support to her other two adopted children.

During the years 1967 to 1969, plaintiff's mother decided that some method had to be devised to ensure continued financial support for plaintiff's wife and children after the mother's death. She was equally concerned about the financial future of her other two adopted children. The mother was worried about plaintiff's inability to manage finances and wanted to make sure that, after her death, he did not unnecessarily deplete his financial sources. Among the considerable assets of plaintiff's mother was a lifetime income interest in the 1927 trust discussed earlier. To prevent the depletion of her children's financial resources after her death, plaintiff's mother, in consultation with her lawyer, decided that her children should put their contingent remainder interests in the 1927 trust (*i.e.,* contingent on the children or their issue surviving the mother's death) into the newly created trusts.

During the period 1967 to 1969, Richard Carvell (Carvell), the mother's attorney, proceeded to draft trust agreements for execution by plaintiff and the other two children which would place in trust their remainder interests in the 1927 trust. Plaintiff maintains, in his deposition, that he was not consulted by Carvell regarding this matter during the period when Carvell was drafting the trusts. Carvell, in his deposition, claims he explained the terms of the trust to plaintiff and to the other children. Plaintiff's mother was concerned about federal gift tax liability when the three children conveyed their remainder interests to the new trusts. She advised that she would not pay any gift tax due on such transfers. The children, on their own, would not, in Carvell's view, have been able to pay any such gift tax at that time. Carvell, after seeking the advice of a tax attorney, decided to set the trust up in such a way that, in the view of both attorneys, any federal gift tax liability would be deferred until after the mother's death.

Specifically, Carvell planned to have the trust instruments delivered, after execution by the three children, to a third party instead of to the trustee with instructions to the third party to hold the instrument until the death of the mother and at her death the trust instruments were to be delivered to the trustee by the third party. Carvell drafted the same substantive language for all three trusts for execution by each of the children. In this way, Carvell hoped to take advantage of one of the basic requirements of trust law for the creation of a valid trust, namely, delivery of the trust property or trust instrument to the trustee. Accordingly, Carvell was of the opinion that these trusts would not be valid until delivery of the trust instruments to the trustee after the mother's death and that any gift tax liability accordingly would be deferred until the date of the mother's death. At this latter time, money would be available to the children for payment of any gift tax liability.

In the process of drafting the trust instruments, Carvell sent a copy of the proposed trust agreement to Wilmington Trust Company (Wilmington Trust), which was to serve as trustee of the trusts, for comment. Wilmington Trust also served as trustee for the 1927 trust. The vice-president of Wilmington Trust sent back to Carvell a letter detailing changes which he felt should be made in the trust instrument as drafted. Interestingly, in this letter the Wilmington Trust vice-president expressed some reservation about the ability of Carvell to ensure the postponement of any gift tax liability merely by delivery of the trust instrument to a third party. Specifically, this letter to Carvell stated: "If, on the other hand, the delivery of the document to an officer of Wilmington Trust Company is intended to place the transaction beyond the further control of the child [trustor], then it seems to us that there might be a basis for a contention by the Government that the transaction had in fact been completed at

the time of delivery, notwithstanding the absence of a formal execution of the document by the Bank." Although one of the concerns in this letter was over the proposed use of the president of Wilmington Trust Company as the third party holder of the trust instrument, clearly the vice-president was concerned not only with the problems posed by having a bank officer designated as the third party holder, but also with the concept of using any third party holder as a device to have the trustor relinquish control over the remainder interests.[3] This letter, in effect, warned Carvell that relinquishment of control over the trust instruments by the children raised potential gift tax liability problems, notwithstanding the delivery of the trust instrument to a third party. Subsequent to receiving the vice-president's letter, Carvell made arrangements with the president of Chestertown Bank of Maryland (Chestertown Bank), a party unrelated to the trustee Wilmington Trust, to take delivery of the trust instruments after their execution. The Chestertown Bank was chosen ostensibly because plaintiff's mother maintained business accounts and personal accounts at the bank. It is noted that the Chestertown Bank did not assess any charge for serving as a conduit for the trust instruments.

On March 19, 1970, Carvell mailed the final trust agreement (1970 trust) to plaintiff, with a letter requesting plaintiff to sign the agreement and to return the original and one copy to Carvell. Similar arrangements were made with the other two children. On April 10, 1970, plaintiff went to the office of his mother's accountant and signed the 1970 trust agreement. He left the trust instrument with the accountant to be deposited with the president of the Chestertown Bank. The letter to the president of the Chestertown Bank, which Carvell had drafted and plaintiff had signed, enclosing the executed 1970 trust agreement, stated in relevant part:

I am enclosing herewith Trust Agreement, which I have executed, and which I hereby request be retained in the files of The President of The Chestertown Bank of Maryland * * * until the death of my mother, Louisa d'A. Carpenter, and that immediately upon her death the enclosed Trust Agreement be delivered by mail or otherwise, to Wilmington Trust Company, Wilmington, Delaware, for acceptance and execution on behalf of Wilmington Trust Company as Trustee of the Trust.

The 1970 trust agreement placed plaintiff's remainder interest in his mother's 1927 trust in an irrevocable trust with Wilmington Trust designated as trustee. The trust agreement provided in pertinent part:

THIS AGREEMENT, made this 10th day of April 1970 between RONALD d'A CARPENTER * * * hereinafter called "Trustor" and WILMINGTON TRUST COMPANY * * * hereinafter called "Trustee", WITNESSETH * * * Trustor now desires to assign, transfer and set over to Trustee all of his right, title, interest and estate whatsoever in the trust created by the aforesaid Declaration of Trust dated September 7, 1927 [plaintiff's remainder interest in his mother's 1927 trust].

NOW, THEREFORE, in consideration of the premises, the mutual covenants hereinafter set forth, and the sum of One Dollar ($1.00) by Trustee to Trustor in hand paid, the receipt of which is hereby acknowledged, Trustor by these presents does hereby, for himself, his heirs, executors, administrators and assigns, *now and forever,* assign transfer, convey, set over and deliver all present and future right, title, interest and estate that he may have * * * [in the] trust created by said declaration of Trust dated September 7, 1927. * * *

Under the terms of the trust, plaintiff's first wife Jeanne, to whom he was married

---

**3.** The vice-president also expressed concern over a potential violation of the rule against perpetuities. The vice-president specifically worried "[i]f the document is intended to be immediately effective to the extent of placing it

beyond any further control by the child signing it, then it would seem not unlikely that the period of the rule against perpetuities may run from that time."

on April 10, 1970, was to receive a 10 percent lifetime income interest in the trust.[4] In addition, plaintiff's two children living at the time of the execution of the 1970 trust were each to receive a 15 percent lifetime income interest in the trust. The 1970 trust also provided for distribution of the trust property upon plaintiff's death. The 1970 trust agreement defined the events which would trigger distribution: "Upon Trustor's death, or if the trust fund or any portion thereof shall become vested in enjoyment in trustee at a time subsequent to the death of Trustor * * *." The exact terms of distribution are not relevant here; it is sufficient to note that the corpus was to be divided into two trusts with income payable to both plaintiff's first wife and his children. The corpus of both of these trusts was eventually to be paid to plaintiff's children when they reached certain specified ages.

One further trust provision should be mentioned at this time. This provision provided in pertinent part:

Anything hereinbefore contained to the contrary notwithstanding the trust herein created shall terminate twenty-one (21) years after the death of the last survivor of Ronald d'A. Carpenter, Jeanne M. Carpenter, and the last surviving child of said Ronald d'A. Carpenter who is living at the time the trust becomes effective on the death of said Louise d'A. Carpenter. * * *

The purpose of the provision was to prevent any interest created by the trust from failing because of a violation of the rule against perpetuities.

Plaintiff maintains that he did not read the 1970 trust agreement prior to or at the time of his signing the trust instrument. However, approximately one week after executing the trust agreement and transmitting the same to the third party holder, plaintiff voiced objection to several provisions of the trust in a telephone call to Carvell. Specifically, plaintiff was displeased by the fact that his wife Jeanne was to receive a 10 percent lifetime income interest in the trust. Plaintiff was experiencing marital difficulties at the time and relations between plaintiff and his wife were not harmonious. Further, plaintiff disliked the fact that the trust made no provision for any children which he might have after the execution of the trust, but only provided for plaintiff's two children then living. In this discussion with Carvell, plaintiff complained about these provisions of the trust but did not attempt to rescind his agreement to the trust. Plaintiff, at this time, did not complain to Carvell that he had not read these provisions before he signed the trust nor did he advise Carvell that he had signed the trust under coercion, duress, or because of undue influence.

From the materials before the court, it is clear that plaintiff did not participate in the drafting of the 1970 trust. The trust itself was unquestionably his mother's idea, not his. However, it is also abundantly clear that plaintiff did not wish to risk the possible alienation of his mother and the potential financial consequences of such an alienation. Plaintiff simply felt that if he had not signed the 1970 trust agreement or failed to accept it, he risked discontinuance of financial support from his mother and the possibility of losing any inheritance under her will.[5] In weighing the advantages and disadvantages of signing the trust agreement, plaintiff obviously came to the conclusion that the scale tipped in favor of signing. Moreover, plaintiff was familiar

4. Plaintiff was divorced from his first wife sometime in 1972 or 1973 because of her dissatisfaction with the marriage. In fact, this first marriage of plaintiff's had been a turbulent one with two earlier separations. Subsequently, plaintiff married, the substituted plaintiff herein, Judith F. Carpenter, and had two children by his second wife.

5. Plaintiff's fear of either disinheritance or discontinuance of financial support was apparently groundless. The depositions of Carvell, the mother's attorney, and Elmer E. Horsey, the mother's accountant, both of whom were intimately familiar with the mother-children relationships, disclose clearly that plaintiff's mother was so greatly concerned for her children's welfare that such disinheritance of or withholding of financial support from her children were most improbable events.

with trusts in general having executed a document in 1962 allowing certain securities in the 1927 trust to be sold. Moreover, plaintiff's mother had assigned to plaintiff on two prior occasions a portion of her lifetime income interest in the 1927 trust.

In the period following his execution of the 1970 trust agreement, plaintiff attempted to have Carvell alter the terms of the 1970 trust in order to include in the trust any children which might be born after the date of the execution of the trust and to exclude his first wife Jeanne from having any beneficial interest in the trust. Plaintiff increased his efforts to exclude his first wife from having a beneficial interest in the 1970 trust after his legal separation from her in August 1971. Between the time plaintiff executed the trust instrument in April 1970, and the death of plaintiff's mother in 1976, plaintiff had numerous conversations with both Carvell and Elmer E. Horsey (Horsey), plaintiff's mother's accountant, relative to getting Carvell to change the trust provisions which plaintiff found objectionable. Carvell, after conversations with plaintiff's mother, agreed to make the changes plaintiff desired. How-

ever, the changes were never made despite plaintiff's frequent urging.[6]

 Importantly, plaintiff never attempted to withdraw the trust instrument on his own initiative from the Chestertown Bank and have the offensive provisions changed. In fact, plaintiff in testimony at a deposition taken in the Delaware Chancery Court action involving the 1970 trusts testified that upon executing the trust instrument and leaving the instrument to be deposited with the Chestertown Bank, he believed that he had relinquished control over the document. Specifically, at the deposition plaintiff was asked: "Between the time you signed the agreement and the date of your mother's death, did you ever make a demand on the Chestertown Bank for return of the trust?" Plaintiff responded: "I never thought I could."[7]

Plaintiff's mother died suddenly on February 8, 1976. On the evening of February 9, 1976, plaintiff contacted his mother's accountant Horsey who had become the intermediary between plaintiff's mother and her children following Carvell's retirement.

**6.** It is important to bear in mind that Carvell and plaintiff's mother wanted to deprive plaintiff and the other two children of any control over their interests in the 1927 trust in order to preserve a financial foundation for their respective families. Accordingly, in 1970, the mother in advising them that she wanted them to execute their trusts stressed that such actions were for their own and their families' best interests. It would be unreasonable, under the circumstances as revealed by the depositions, not to conclude that in executing the 1970 trust agreements plaintiff and the other two children were aware they were relinquishing all control over their remainder interests in the 1927 trust.

**7.** Defendant objects in its brief to plaintiff's use of this deposition in support of plaintiff's motion for summary judgment contending that plaintiff's testimony was hearsay not within the hearsay exception in Fed.R.Evid. 804(b)(1) since defendant was not a party in the previous action and thus had no opportunity to cross-examine plaintiff. Defendant also maintains that no party in the state action had a similar motive to cross-examine plaintiff as defendant has in this action because payment of a gift tax was not an issue in that case. Defendant, however, misinterprets the requirements of 804(b)(1); under this rule deposition testimony is admissible if the declarant is unavailable to testify and

a party in the prior proceeding had "an opportunity and similar motive to develop the testimony by direct, cross or relevant examination." To satisfy the requirements of this rule, there does not have to be complete identity of parties and issues; there is sufficient identity of issues if the issues in the prior proceeding were such that they ensured cross-examination on the issues relevant in the subsequent case. *Hicks Co. v. Commissioner,* 470 F.2d 87, 90 (1st Cir. 1972); *In re Master Key Antitrust Litigation,* 72 F.R.D. 108, 109 (D.Conn.1976) *aff'd* 551 F.2d 300 (2nd Cir.1976). *See* C. McCormick, *Handbook of the Law of Evidence,* 619–620 (2d ed. 1972). In the earlier Delaware Court of Chancery action, plaintiff's first wife Jeanne and his two children by his first wife Jeanne, were also beneficiaries of the 1970 trust, and were represented by counsel. They, like the defendant in this case, attempted to uphold the validity of the 1970 trust. Furthermore, the issues in that case specifically involved the validity of the 1970 trusts, just as the basic issue in this case is the validity of the 1970 trust plaintiff executed. Therefore, plaintiff's deposition testimony of the Delaware Chancery Court action is within the pale of the hearsay exception set forth in Fed.R.Evid. 804(b)(1).

Plaintiff asked the accountant to stop the Chestertown Bank from delivering the 1970 trust agreement to Wilmington Trust as instructed by plaintiff's April 10, 1970 directive. After contacting the Chestertown Bank on February 10, 1976, the accountant discovered that the trust instrument had already been sent to Wilmington Trust. Upon learning that the trust instrument had already been mailed to the trustee, plaintiff then went to Wilmington Trust and tried to stop the trustee from taking delivery of the trust agreement. Wilmington Trust received delivery of the trust instrument on February 10, 1976. Plaintiff went to Wilmington Trust on February 10, 1976, in a effort to block delivery of said instrument to the bank. However, his efforts were unsuccessful.

Plaintiff subsequently demanded of Wilmington Trust his one-third (⅓) interest in the corpus of the 1927 trust free of trust contending that the 1970 trust was invalid. When presented with plaintiff's demand, Wilmington Trust filed a Petition for Instructions in the Delaware Court of Chancery in order to receive instructions on the proper method of distribution of the 1927 trust. In this action, plaintiff's ex-wife Jeanne and the guardian for plaintiff's minor children, et al., opposed the invalidation of the 1970 trust agreement and contended that the corpus of the 1927 trust was to be distributed according to the terms of the 1970 trust agreement.

This Chancery action was settled by agreement of the parties in December 1977. Under the terms of this settlement, the 1970 trust was replaced by three separate trusts and plaintiff received the balance of his ⅓ interest in the 1927 trust which was not distributed to these 3 trusts. In addition, this settlement required plaintiff to file a federal gift tax return and report the transfer of his 1927 trust interest as a gift taxable in 1970. Plaintiff reserved the right to file for a refund of any gift tax and interest paid. On December 30, 1977, plain-

tiff filed a gift tax return reporting taxable gifts of $512,697.24 for the year ending December 31, 1970. He also paid a gift tax of $81,101.02 and $35,616.84 in interest.[8] On December 21, 1979, plaintiff filed a claim for a refund for the total amount of the gift tax and interest paid. This claim for a refund was rejected. In addition, on June 1, 1981, the IRS issued to plaintiff a Statutory Notice of Deficiency which assessed plaintiff an additional gift tax of $26,261.99. The reason for this deficiency assessment was the IRS's calculation that the value of plaintiff's remainder interest in the 1927 trust at the time of his execution of the 1970 trust was $631,096.83, not $512,697.24 as originally reported by plaintiff. In addition, the IRS disallowed a marital deduction on the transfer because the interest transfer was a terminable interest and, thus, not eligible for a marital deduction.

Plaintiff paid the assessed deficiency and filed a claim for refund of the additional gift tax paid. This claim was rejected on September 9, 1981. Plaintiff thereafter brought the present action seeking a refund of $142,979.85, plus interest, the amount of federal gift tax and interest paid by him on the transfer in 1970 of his remainder interest in the 1927 trust.

## II.

Plaintiff, as indicated previously, advances three arguments to avoid the imposition of a gift tax under section 2501(a)(1) of the Internal Revenue Code to the transfer of his remainder interest in the 1927 trust to the 1970 trust: Plaintiff first contends that the trust at issue was not created in 1970 because the trust instrument was not physically delivered to the trustee after plaintiff's execution of the trust agreement. Second, plaintiff claims that the 1970 trust was invalid because it was executed under coercion, duress, and undue influence exerted on him by plaintiff's mother and her attorney. Third, plaintiff maintains that

---

**8.** Plaintiff and first wife Jeanne filed under the gift splitting provisions of the Internal Revenue Code. I.R.C. § 2513 (1964). Plaintiff, however, paid the total amount of the gift tax and interest due on the gift transfer to the 1970 trust when the original gift tax return was filed on December 30, 1977.

the 1970 trust was invalid because he failed to read or understand the trust agreement at the time of execution.

■ A common thread woven into each of these three arguments is plaintiff's contention that he lacked the requisite intent to create a valid trust at the time he signed the 1970 trust agreement. It is axiomatic that in order for the trustor to create a valid trust he must have had a present intention to do so at the time the trust is alleged to have been created. *Trustees of Graceland Cemetery Improvement Fund v. United States,* 206 Ct.Cl. 609, 629, 515 F.2d 763, 774 (1975); *International Harvester Co. v. United States,* 169 Ct.Cl. 821, 831, 342 F.2d 432, 437 (1965). A. Scott *The Law of Trusts,* § 26 (3rd ed. 1967); G. Bogert *The Law of Trusts and Trustees,* § 46 (2nd ed. 1965). Therefore, any analysis of plaintiff's arguments must begin with an examination of the terms of the 1970 trust agreement and the intention expressed therein. In addition, the analysis must also consider whether any of the materials before the court on this motion disclose a contradiction between plaintiff's intention and the express language of the 1970 trust agreement.

■ On April 10, 1970, plaintiff signed a trust agreement, the language of which expressly declared his intention to create a trust and convey his remainder interest to that trust on the date he signed it. The first line of the trust agreement stated: "THIS AGREEMENT, made this 10th day of April 1970 * * *." The trust agreement then continued on to recite precisely the terms of this agreement. Specifically the establishment clause of the agreement provided: "Trustor *now* desires to assign, transfer and set over to trustee all of his right, title, interest and estate whatsoever in the trust * * * dated September 7, 1927 * * *." (Emphasis added.) The trust agreement continued: "Trustor by these presents does hereby * * * assign, transfer, convey set over and deliver all present and future right, title, interest and estate that he may have, whether vested, contingent or in expectancy, in and to said trust created

by said Declaration of Trust dated September 7, 1927 * * * unto Trustee and its successors, IN TRUST * * *." This language unequivocally created a trust and conveyed plaintiff's remainder to that trust on April 10, 1970, the date of the execution of the 1970 trust agreement. A person's signature on a written instrument normally indicates assent to the terms of that document. *Rossi v. Douglas,* 203 Md. 190, 199, 100 A.2d 3, 7, (1953); 1 S. Williston, *A Treatise on the Law of Contracts,* § 90A. (3rd ed. 1957). Thus by signing the 1970 trust agreement, plaintiff expressed his assent to the terms of the agreement and intention to be bound by those terms.

■ Plaintiff disputes the fact that the trust agreement language unequivocally created a valid trust on April 10, 1970. To support his contention, plaintiff relies on a provision in the trust designed to prevent a violation of the rule against perpetuities. This provision provides: "Anything hereinbefore contained to the contrary notwithstanding the trusts herein created shall terminate twenty-one (21) years after the death of the last survivor of Ronald d'A. Carpenter, Jeanne M. Carpenter and the last surviving child of said Ronald d'A. Carpenter, who is living at the time the trust becomes effective on the death of the said Louisa d'A. Carpenter * * *." Plaintiff maintains that the language in this provision unmistakably provided that the effective date of the trust was the date of Louisa d'A. Carpenter's death, not the date the trust agreement was executed.

Plaintiff's argument, however, ignores the fact that this provision concerned only the date of the termination of the 1970 trust agreement. Its main purpose was not to define the date on which the trust became valid, but rather to define the date on which the trust terminated. Thus, its mention of the effective date of the trust was only to allow computation of the time at which the trust would end. Such an oblique reference to the creation of the trust does not contradict the plain language in

the trust's establishment clause discussed above. Indeed, as the December 29, 1969, letter from the vice-president of Wilmington Trust to Carvell clearly shows, doubt existed at the time the trust was drafted whether this provision, in fact would prevent a violation of the rule against perpetuities. Specifically, the vice-president was concerned that the language of the trust document as a whole would be interpreted as creating the trust on the date the document was signed, thus vitiating the rule of perpetuities clause quoted *supra* at 711.[9]

The language difference between the rule of perpetuities savings clause and the trust's establishment provision is a reflection of the fact that Carvell sought to achieve two contradictory goals with the creation of the 1970 trust. First and foremost, Carvell wanted to place plaintiff's remainder interest in the 1927 trust beyond plaintiff's control so that it would not be squandered. Carvell could ensure the protection of this remainder interest only if plaintiff relinquished control prior to his mother's death because plaintiff's remainder became possessory at his mother's death. Furthermore, any incentive to follow his mother's wishes would have been removed by her death since she would no longer be the main source of plaintiff's financial support. Accordingly, Carvell drafted the 1970 trust agreement to ensure that by its terms plaintiff transferred his remainder interest to the trust at the time of the execution of the trust agreement.

Such a transfer by plaintiff, however, also had the unwanted effect of creating federal gift tax liability. Since plaintiff's mother would not, and plaintiff could not, pay such a tax, Carvell wished to structure the transfer of plaintiff's remainder interest in such a manner that any gift tax liability would be deferred until plaintiff's mother's death. Thus, in essence, Carvell intended to effect a transfer of plaintiff's remainder interest, *i.e.*, depriving plaintiff of control over said interest, without incurring the gift tax liability inherent in such a transfer. To this end, Carvell drafted the 1970 trust agreement so that by its express terms plaintiff transferred his remainder interest to that trust. To accomplish his second objective, postponement of any gift tax liability, Carvell relied on his failure to comply strictly with the formalistic requirements of trust law, *i.e.*, that the trust instrument or property be delivered to the trustee before a trust is legally created and effective.

In order to circumvent the trust instrument's express language, plaintiff argues that delivery of the trust instrument to a third party, rather than to the trustee, postponed the creation of the trust until the date of the instrument's actual delivery to the trustee. Both plaintiff and defendant moved for summary judgment on this issue

---

**9.** The reason for the vice-president's concern was the fact that if the trust was considered to have been effectively created on the date of plaintiff's execution of the trust agreement, then the 1970 trust created certain contingent interests in the corpus of the 1970 trust which might vest at a time beyond the period allowed by the rule against perpetuities. In plaintiff's briefs, there was no specific contention that certain provisions of the 1970 trust violated the rule. Plaintiff raised this argument for the first time at oral argument; at which time he contended provisions I B and II of the trust's distribution section violated the rule because the contingent interests created in these sections were not certain to vest within the time allowed by the rule if 1970 was the effective date of the trust's creation. As a result, plaintiff maintained the whole 1970 trust was invalid. Even if it is assumed, *arguendo*, that these provisions violated the rule, such a violation

invalidated only those specific clauses, not the whole trust. Under Delaware law, which the trust document expressly adopted as the law governing its interpretation, trust provisions which violate the rule can be excised and the remaining trust provisions upheld as valid. *P. v. Wilmington Trust Co.*, 41 Del.Ch. 109, 188 A.2d 361, 363 (1962), *aff'd* 41 Del.Ch. 191, 191 A.2d 98 (1963). *Wilmington Trust Co. v. Wilmington Trust Co.*, 25 Del.Ch. 121, 151–152, 15 A.2d 153, 167–168 (1940) *aff'd* 26 Del.Ch. 397, 24 A.2d 309 (1942). Moreover, such application of the rule conforms with the modern trend. *See Smith's Estate v. Commissioner*, 140 F.2d 759, 763–764 (3rd Cir.1944); G. Bogert, *The Law of Trusts and Trustees*, § 213, pp. 170–171 (2d revised ed. 1979). Here the provisions alleged by plaintiff to violate the rule can be excised and the basic purpose of the 1970 trust is still retained.

and both agreed that there are no material facts in dispute on this issue.[10]

In order to create a valid trust, it is necessary that the formalities which vest title in the trustee be observed; this includes delivery of the trust instrument to the trustee. As stated by Bogert in *The Law of Trusts and Trustees, supra:*

> The decisions are in accord that in case of instruments which constitute declarations of trust and that which effect transfers to a third person as trustee, the trust is not complete without delivery of the instrument. The declaration is a conveyance of an equitable interest; the trust transfer is a conveyance of a legal and equitable interest. Both are subject to the same rules applying to absolute conveyances, namely, that delivery is a prerequisite to any legal conveyance.

*Id.* at § 147, p. 61–62 (footnotes omitted). *See also* A. Scott, *The Law of Trusts* § 32.2 (3d ed. 1967).

This delivery requirement does not mean, however, that the trust instrument must be physically handed to the trustee in order to create a valid trust. Rather, delivery in this context "means the manifestation of intention that the instrument in question shall have operative effect * * *. It relates to expression of the idea that the document is to cause a change in legal relations at once." Bogert, *supra,* at § 147, p. 60. Thus, there may be sufficient delivery when the instrument is given to a third party for delivery to the trustee. Bogert, *supra,* § 147; Scott, *supra,* § 32.2. *See also Fike v. Harshbarger,* 273 Md. 586, 589, 332 A.2d 27, 28–29 (1975); *Meise v. Tayman,* 222 Md. 426, 430–431, 160 A.2d 916, 919–920 (1960).

The courts have usually encountered this constructive delivery issue in the context of determining the validity of deeds, an analogous situation to the creation of a trust since, in each context, the conveyance is complete only upon delivery of the instru-

ment to the trustor or grantor. *See e.g., Meise v. Tayman, supra,* 222 Md. at 430–431, 160 A.2d at 919–920. In the context of constructive delivery of a deed, the courts have focused upon the extent of control retained by the grantor over the instrument after delivery to the third party. As one court stated in defining the elements necessary for constructive delivery: "If a grantor deposit[s] a deed with a third person, without power of revocation or recall by the grantor, and with directions that it be held until the grantor's death, then put upon the record by the holder, this is sufficient delivery and will be effectual to pass title to the grantee * * *." *Newell v. Pierce,* 131 Neb. 844, 845, 270 N.W. 469, 470 (1936) quoting *Dunlap v. Marnell,* 95 Neb. 535, 145 N.W. 1017 (1914). *See also Wilcox v. Hardisty,* 212 P. 633, 60 Cal.App. 206 (1922); *Saltzsieder v. Saltzsieder,* 219 N.Y. 523, 114 N.E. 856 (1916); Bogert, *supra,* § 147 p. 60.

The specific issue to be decided here is whether plaintiff by depositing the 1970 trust agreement with the Chestertown Bank, the third party holder, so relinquished his control over the instrument that it evidenced his intention to have the trust instrument cause a change in legal relations. The intention of the trustor to be examined and that which is controlling is the intention existing at the time plaintiff left the trust instrument to be deposited with the third party. *See Wilcox v. Hardisty, supra,* 212 P. at 635, 60 Cal.App. at 211. In this case this would be plaintiff's intention at the time of execution since he executed the trust agreement and immediately thereafter left it with Horsey so it could be deposited with the Chestertown Bank. Both parties agree that the facts necessary for resolution of this issue are undisputed, but each party draws different inferences and conclusions from these facts.

In this case, plaintiff in his letter of instructions to the Chestertown Bank clearly

---

**10.** Obviously, success by plaintiff in this claim only means, without more, a deferment of the federal gift tax until 1976, the date of the delivery of the trust instrument to the trustee. Furthermore, even if plaintiff is successful on all three of his claims, there would still be federal gift tax liability for plaintiff's transfer in 1977 of its remainder interest pursuant to the terms of the 1977 settlement in the Delaware Chancery Court action. Certainly, plaintiff cannot avoid federal gift tax liability altogether.

did not expressly reserve any right to amend, revoke, or withdraw the trust instrument. The letter to the Chestertown Bank merely stated that it was to hold the instrument until plaintiff's mother's death and then deliver it to the trustee. It made no mention of a request by plaintiff to amend, revoke, or withdraw the instrument.

Moreover, plaintiff's conduct after the signing of the trust agreement, his deposition testimony, and the circumstances surrounding the creation of the trust compel the conclusion that plaintiff maintained no implied reservation of control over the trust instrument. Shortly after plaintiff signed the 1970 trust agreement, he became upset at some of the trust provisions and desired to have them changed. In fact, from shortly after his signing the agreement until his mother's death, plaintiff greatly desired to have the trust agreement changed to provide for his afterborne children and his second wife. To accomplish this end, plaintiff had numerous conversations with Carvell and Horsey and throughout this period attempted to get Carvell to change the offensive provisions in the trust agreement. Despite his attempts, plaintiff's desires were frustrated and the trust agreement was never amended. However, not once during this period did plaintiff attempt to withdraw the trust instrument from the Chestertown Bank either by himself or with the help of an attorney in order to amend the offensive provisions. Certainly, if plaintiff believed that he retained control over the trust document while it was held by Chestertown Bank, he would have made arrangements to withdraw the instrument in order to make the necessary changes in the trust agreement. The fact that he did not do so supports the conclusion that he did not intend to retain control over the trust instrument after he left it with Horsey to be deposited with the Chestertown Bank. Plaintiff's deposition testimony also supports this conclusion. Plaintiff was specifically asked at his deposition in the Delaware Chancery Court action why he did not withdraw the trust instrument himself. Plaintiff's response was: "I didn't think I could."

In addition, the circumstances surrounding the creation of the trust demonstrate that the specific purpose of the trust was to imbrue in plaintiff the fact that he would relinquish control over his remainder interest upon execution of the 1970 trust agreement. The materials before the court disclose that the primary reason for the creation of the 1970 trust agreement was to deprive plaintiff of control over his remainder interest in the 1927 trust. To accomplish that purpose it was imperative that plaintiff understand that he would give up control over the trust instrument upon execution of the trust agreement. Consequently, when plaintiff executed the 1970 trust agreement and left it with Horsey to be deposited with the Chestertown Bank, it seems clear he did not intend to preserve any control over the trust instrument.

Plaintiff relies upon the fact that he attempted to get Carvell to change the trust agreement as evidence that he did not intend to relinquish control over the trust instrument when it was deposited with the Chestertown Bank. In fact, plaintiff's efforts to get Carvell to change the terms of the trust do not support the conclusion that plaintiff intended to retain control over the trust instrument. On the contrary, these efforts prove that by leaving the trust document to be deposited with the Chestertown Bank, plaintiff intended to relinquish control over the trust instrument and cause a change in legal relationships. Furthermore, the mere fact that plaintiff believed that Carvell could change the trust provisions despite the inclusion of an irrevocable provision in the trust agreement is, at most, an indication of plaintiff's lack of understanding of some of the specific trust provisions, not an indication of reserved control.

Plaintiff also attempts to bolster his contention that plaintiff intended delivery to the Chestertown Bank to postpone the creation of the trust with two additional arguments. First, plaintiff relies on a statement by the Chestertown Bank president that, if asked, he would have given plaintiff the trust instrument. Secondly, plaintiff argues that the extensive planning of the

trust's drafters to defer the creation of the trust until plaintiff's mother's death indicates that plaintiff as trustor intended to maintain control of the trust instrument until his mother's death.

Both of these arguments are wide of the mark, however, because it is the intent and belief of the *trustor* which is determinative of the validity of the trust, not that of the drafters of the trust agreement or the third party holder. *See Trustees of Graceland Cemetery Improvement Fund v. United States, supra,* 206 Ct.Cl. at 629, 515 F.2d at 774; *International Harvester Co. v. United States, supra,* 169 Ct.Cl. at 831, 342 F.2d at 437. Bogert, *supra,* at §§ 41, 48; Scott, *supra,* at § 23. Thus, the belief of the third party holder is irrelevant here. As for the intent of the drafters of the 1970 trust agreement, their intent was clearly different than plaintiff's since it was a necessary part of their plan to instill in plaintiff the belief that he had relinquished control over the trust instrument upon his execution of the 1970 trust agreement and his leaving the trust instrument with Horsey to be deposited with the third party holder. Therefore, plaintiff by leaving the 1970 trust instrument with Horsey for deposit with Chestertown Bank effected constructive delivery of the trust instrument to the trustee as a matter of law. As the Supreme Court stated in *Smith v. Shaughnessy,* 318 U.S. 176, 63 S.Ct. 545, 87 L.Ed. 690 (1943): "The essence of a gift by trust is the abandonment of control over the property put in trust." *Id.* 318 U.S. at 181, 63 S.Ct. at 547. In this case, plaintiff clearly abandoned control over the trust instrument (and the intangible trust property it represented), and therefore he made a taxable gift of his remainder interest to the trust at that time in 1970.

### III.

Plaintiff also presents two additional claims the purpose of which is to invalidate completely the 1970 trust agreement. To this end, plaintiff argues: First, the trust was created under duress, coercion and undue influence by plaintiff's mother and her

attorney, and second that plaintiff did not read or understand the trust agreement before he signed it. As mentioned earlier, defendant has moved for summary judgment on both claims, and plaintiff opposes this motion contending that there are disputed issues of material fact which must be decided at trial.

### A. *Coercion, Duress, Undue Influence*

Plaintiff's argument on his claim of coercion, duress and undue influence is based upon plaintiff's dependence on his mother's financial support. Essentially, plaintiff contends that his mother's attorney, Carvell, threatened that his mother would disinherit him and discontinue any financial support unless plaintiff signed the 1970 trust agreement. Accordingly, plaintiff maintains that he did not intend to transfer his remainder to the 1970 trust but only did so out of fear of losing the financial help of his mother.

■ In order to constitute coercion, duress, or undue influence, the improper actions alleged must be of such a compelling nature that they were sufficient to overpower the free will of the party executing the written document. *Systems Technology Assoc., Inc. v. United States,* 699 F.2d 1383, 1387 (Fed.Cir.1983); *MacKay v. Costigan,* 179 F.2d 125, 132 (7th Cir.1950); *Creighton v. Creighton,* 261 F. 333, 335 (8th Cir.1919). *Collins v. United States,* 209 Ct.Cl. 413, 421, 532 F.2d 1344, 1349 (1976); *Beatty v. United States,* 144 Ct.Cl. 203, 206, 168 F.Supp. 204, 206–207 (1958). Moreover, the Court of Claims has held that "economic pressure and 'even the threat of considerable financial loss' are not duress." *Johnson, Drake & Piper, Inc. v. United States,* 209 Ct.Cl. 313, 321, 531 F.2d 1037, 1042 (1976) quoting *International Tel. & Tel. Corp. v. United States,* 206 Ct.Cl. 37, 52–53 n. 11, 509 F.2d 541, 549 n. 11 (1975).

■ An examination of the materials in this case reveals no evidence to suggest the overpowering of plaintiff's will power in order to procure his signature on the 1970 trust agreement. Plaintiff sets forth no facts which he would present at trial which

would establish that he was completely helpless and unable to decide rationally what course of action was in his best interests. Instead, this is simply a case of a 35-year old business college graduate who, through his own choice, remained financially dependent upon his mother. Plaintiff was not physically or mentally handicapped, nor was he impaired in any way from supporting himself and his family without his mother's assistance. Further, plaintiff was under no unusual financial strain when he signed the trust instrument which would have made him particularly susceptible to threats of a cutoff of financial assistance. It is clear from the record that plaintiff weighed the financial consequences of alienating his mother and determined that it was to his benefit to sign the 1970 trust agreement. Indeed, plaintiff never complained to either his mother or her attorney that he was being compelled to execute the 1970 trust agreement against his will. In fact, the dissatisfaction expressed by plaintiff after he signed the trust agreement was directed toward the details of distribution of the trust income, not the establishment of the trust. Nor is plaintiff's claim of coercion, duress, and undue influence supported by the fact that his signing of the 1970 trust agreement was improvident in light of his marital difficulties at that time and the failure of the trust agreement to provide for afterborne children. Since the trust agreement was mailed to plaintiff several weeks before he signed it, he had ample opportunity to attempt to get specific provisions of the trust changed before signing. There is no evidence in the record that plaintiff made any such attempt or that he even complained about the offensive provisions before executing the trust agreement. Accordingly, plaintiff cannot use the improvidence of the trust's provision as proof of coercion, duress, and undue influence.

Although plaintiff insists there are disputed facts which must be decided at trial, he has not presented any evidence to support a claim of coercion, duress, or undue influence. To avoid summary judgment against him, plaintiff cannot rest on the mere assertion that disputed facts exist which must be resolved at trial, rather it is plaintiff's duty to specify some evidence which will prevent the trial from becoming a useless formality. *Doff v. Brunswick Corp.,* 372 F.2d 801, 805 (9th Cir.1966). *See also Richard Wilson Corp. v. United States,* 4 Cl.Ct. 171 at 174–75 (1983) (Margolis, J.); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). Plaintiff has failed to do so.[11]

The inescapable conclusion to be drawn from the materials currently before the court is that the sole basis for plaintiff's claim are threats by Carvell of disinheritance by plaintiff's mother and a withdrawal of the mother's financial assistance. In the circumstances of this case, plaintiff's mother had a legal right to disinherit him and withdraw her financial assistance; she was under no legal obligation to support him or provide him with an inheritance. *Kazaras v. Manufacturers Trust Co.,* 4 A.D.2d 227, 235, 164 N.Y.S.2d 211, 218 (1957). Threats to do what one has a right to do, are not coercion or duress unless such actions are deemed to violate fundamental notions of fair dealing, *Systems Technology Assoc, Inc. v. United States, supra,* 699 F.2d at 1387–1388. *See Mills v. United States,* 187 Ct.Cl. 696, 699, 410 F.2d 1255, 1257 (1969). *Beatty v. United States, supra,* 144 Ct.Cl. at 205–06, 168 F.Supp. at 206. Threats of disinheritance or withdrawal of financial support certainly do not violate fundamental notions of fair dealing in a context such as this, since here plaintiff's mother was attempting to ensure the financial stability of his family. Furthermore, absent extraordinary circumstances a parent's threat of disinheritance or withdrawal

---

11. At oral argument, in response to a question from the court, plaintiff was unable to set forth additional material facts which he would adduce at trial that, if accepted by the court, would produce a favorable result for plaintiff. In substance, plaintiff's response in this regard, was that any facts produced at trial would probably be corroborative of those already before the court in the materials produced by the parties in support of their respective motions and opposition.

of financial assistance to a mature child does not constitute duress, coercion or undue influence as a matter of law. *Kazaras v. Manufacturers Trust Co., supra,* 4 A.D.2d at 235, 164 N.Y.S.2d at 218.[12] In light of the record before the court and the relevant case law precedent, it is clear that plaintiff's claim that the 1970 trust agreement was invalid because of coercion, duress, or undue influence must be rejected as a matter of law.

## B. *Failure to Read*

■ Similarly, plaintiff's contention that he failed to read or understand the 1970 trust agreement before executing it also fails, as a matter of law, to invalidate the 1970 trust. Plaintiff's claim here is not based upon the fact that he suffered from some mental or physical handicap which prevented him from reading the trust agreement. Plaintiff suffered from no such handicap. Instead, this claim is based upon the bare assertion that plaintiff simply didn't read the 1970 trust agreement before he signed it.

■ Failure to read a written document before signing does not enable one to ignore the obligations imposed by that document. As the Court of Claims stated, "if a party to a contract is able to but does not read it, then he is negligent, and can not plead this negligence in his defense." *Ellicott Machine Co. v. United States,* 43 Ct.Cl. 469, 478–79 (1908), *rev'd on other grounds,* 223 U.S. 524, 32 S.Ct. 334, 56 L.Ed. 535 (1912). *See also Fraass Surgical Mfg. Co. v. United States,* 215 Ct.Cl. 820, 830, 571 F.2d 34, 40 (1978); *Richardson Camera Co. v. United States,* 199 Ct.Cl. 657, 665, 467 F.2d 491, 496 (1972). Another court summarized this same rule when it declared, "[o]ne who reads a written document or signs it (even

without reading it) is bound by its terms. 'Although plaintiff testified he merely 'glanced' at this instrument * * * it is the universal rule that he cannot thus evade his responsibilities for its terms and conditions." *St. Petersburg Bank & Trust Co. v. Boutin,* 445 F.2d 1028, 1032 (5th Cir.1971) quoting *Lawrence v. Muter Co.,* 171 F.2d 380, 384 (7th Cir.1948). *See also Upton v. Tribilcock,* 91 U.S. 45, 50, 23 L.Ed. 203 (1875). 1 Williston, *supra,* at § 35.

Plaintiff here had ample opportunity to read the trust agreement since it was sent to him on March 19, 1970, and he did not sign it until April 10, 1970. Plaintiff also had the ability to read the trust agreement as evidenced by his degree from a business college. Moreover, plaintiff was no stranger to trust matters since he had had dealings with trust matters prior to his execution of the 1970 trust agreement. If plaintiff felt that the language in the trust agreement was too technical for him to understand, he could have consulted with an attorney or other expert conversant in the field of trusts. The record, however, discloses no evidence of any attempt by plaintiff to secure such advice.

Plaintiff blithely asserts that his "failure to read" claim involves disputed facts and thus must await trial for disposition. Basically, plaintiff contends that he signed the 1970 trust agreement without reading it because of his fear of alienating his mother and losing her financial support. This claim thus incorporates some of the factual allegations of the coercion, duress, and undue influence claim discussed above. The essence of this "failure to read" claim is that because plaintiff did not read the 1970 trust agreement before signing it, he lacked the intent to create a trust when he signed it; therefore, plaintiff contends the 1970 trust was invalid because plaintiff had no

---

**12.** The court in *Kazaras v. Manufacturers Trust Co.,* 4 A.D.2d 227, 164 N.Y.S.2d 211 (1957) found no coercion, duress or undue influence as a matter of law in circumstances where the trustor was a physically handicapped 36-year old daughter who was dependent upon her father for financial support, who created a trust at the father's insistence and who, upon his death, sought to have the trust declared invalid

on grounds of coercion, duress and undue influence. Nor is *In Re Langmeier,* 466 A.2d 386 (Del.Ch.1983), cited by plaintiff at oral argument, apposite here since the person alleged to have been coerced and subjected to undue influence in that case was an 85-year old widow who had no living relatives and who suffered from senility and judgment impairment as a result of organic brain damage.

present intention to create a valid trust at the time he signed the 1970 trust agreement.

Despite plaintiff's assertion to the contrary, a review of this record discloses no genuine issue of fact material to plaintiff's claim. Even if plaintiff's contention that he did not read the 1970 trust agreement before executing it is assumed to be true, this failure does not excuse plaintiff from the terms.[13] Further, plaintiff cannot evade his responsibilities under the 1970 trust agreement by alleging that this failure to read the agreement resulted from his fear of losing financial support from his mother. As discussed above, even if such threats in fact took place, these threats did not constitute coercion, duress, or undue influence nor did these threats relieve plaintiff of the consequences of his negligence in failing to read the agreement or negate the express intention of the document's language. Therefore, as a matter of law, plaintiff's failure to read the trust agreement before signing it did not invalidate the 1970 trust agreement.

### IV.

This case involves special circumstances which must be taken into account in determining whether disposition by summary judgment is appropriate.[14] Both parties at oral argument reaffirmed the views expressed in their briefs that plaintiff's first claim does not involve any issues of material fact and that, therefore, the court can decide the issue as a matter of law. On the second and third claims, however, plaintiff maintains that issues of material fact exist;

a contention with which defendant disagrees. In its discussion on the second and third claims, the court concluded that no issues of material fact were in dispute and that plaintiff could not recover on the claims as a matter of law.

The resolution of the issues raised by all three claims involved a determination of plaintiff's intent in creating the 1970 trust, in other words, whether plaintiff intended to create a trust effective at the time he executed the 1970 trust agreement. Generally, the resolution of intent is an issue of fact inappropriate for resolution by summary judgment. *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1128–1129 (6th Cir.1981), *cert. denied* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). However, "the question whether summary judgment is appropriate in any case is one to be decided upon the particular facts of that case. * * *" *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 258, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569 (1968). On the particular facts of this case, the court has concluded that summary judgment is appropriate.

Plaintiff in this case signed a trust instrument by the explicit terms of which he both created a trust and conveyed his remainder in the 1927 trust to that trust, effective on April 10, 1970. The conclusion that the 1970 trust agreement was unambiguous concerning its effective date was clearly appropriate for summary judgment since the issue of whether a written document presents ambiguity is one of law, not of fact. *Heheman v. E.W. Scripps Co., su-*

---

**13.** Although for the purposes of this motion the court has assumed plaintiff's allegation to be true, there is support in the materials before the court which suggests that plaintiff did, in fact, read the 1970 trust agreement before executing it. For example, Horsey, in his deposition—parts of which have been appended to the briefs of both parties—indicates that plaintiff asked him some questions about the substance of the trust agreement before signing the agreement, thereby suggesting that he had read the agreement before executing it.

**14.** At oral argument counsel advised the court that there were federal gift tax cases involving

the trusts executed by plaintiff's two adopted sisters pending before both the United States Claims Court and the United States Tax Court (*Sonia C. Tingle v. United States,* Docket No. 445–82T consolidated with *Richard M. Tingle v. United States,* Docket No. 444–82T; *Carla C. Matthews v. Commissioner,* Docket No. 22211–81). It is important to point out that the determination of the appropriateness of summary judgment in this case is confined to the unique facts and circumstances of this case, chief of which is the death of Ronald Carpenter, who would have been the primary witness in support of plaintiff's claims.

*pra,* at 1128; *Kraus v. United States,* 177 Ct.Cl. 108, 115–116, 366 F.2d 975, 979 (1966).

■ A determination of whether, as a matter of law, the explicit language of the 1970 trust agreement was abrogated by delivery of the trust instrument to a third party, by coercion, duress and undue influence; or by plaintiff's failure to read the agreement was also appropriate given the particular facts and circumstances of this case. First, as noted above, both parties agree that the nondelivery to trustee claim presents no issue of material fact. Second, the material facts which plaintiff contends are at issue on the second and third claims concern the plaintiff's subjective intent in creating the 1970 trust, given the type of coercion, duress, and undue influence alleged and plaintiff's failure to read the trust agreement before signing it. Plaintiff is the one person who could provide the court with the best evidence of his subjective intent at the time he executed the 1970 trust agreement. Plaintiff, however, is deceased. Consequently, the best evidence of his intent is the deposition testimony which he gave in the Delaware Chancery Court action. The court has before it on this motion the relevant portions of this deposition. Third, a review of the list of documents and witnesses which would be presented in the event of a trial convinces the court that all the facts and circumstances necessary for the resolution of the above issues are currently before the court.

Furthermore, a disposition of all three of plaintiff's claims on summary judgment comports with one of the basic purposes of summary judgment. "Summary judgment has, as one of its most important goals, the elimination of waste of time and resources of both the litigants and the courts in cases where a trial would be a useless formality." *Zweig v. Hearst Corp.,* 521 F.2d 1129, 1135–1136 (9th Cir.1975), *cert. denied* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399; *see United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978); *Doff v. Brunswick, supra,* 372 F.2d at 805. Given the considerations discussed above, the court is of the view that it would receive no further enlighten-

ment at trial on the issues raised by plaintiff's claims. Any trial would simply be a useless formality which would waste both the court's and the litigant's time and serve no beneficial purpose, but merely prolong this case. *See Mills v. United States, supra,* 187 Ct.Cl. at 701–702, 410 F.2d at 1258. This determination has been reached with great care and with full realization of its result. It is the court's view that the grant of summary judgment herein is appropriate and necessary since the materials before the court contain all the facts and circumstances necessary for the resolution of plaintiff's claims and defendant, as moving party, is entitled to judgment as a matter of law. *See Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 891 (Fed.Cir.1983).

No facts have been alleged nor has an appropriate affidavit containing the same been proffered indicating the existence of disputed material facts which would require a trial. Indeed, mere conclusions or opinion in the briefs of plaintiff, or statements at oral argument by counsel regarding proposed witnesses, even if set forth in an affidavit, are, and would be, insufficient to defeat a motion for summary judgment. *Stevens v. Barnard,* 512 F.2d 876, 878–879 (10 Cir.1975); *Cohen v. Ayers,* 449 F.Supp. 298 (N.D.Ill.1978), *aff'd* 596 F.2d 733 (7th Cir.1979).

## V.

In summary, the court determines that, as a matter of law, plaintiff created a valid trust at the time he executed the 1970 trust agreement. In so holding, the court determines as a matter of law, that, on the circumstances of this case, the act of leaving the trust instrument with Horsey for deposit at the Chestertown Bank constituted constructive delivery to the trustee. Further, the court determines as a matter of law that, on the circumstances of this case, the 1970 trust agreement is not invalid because of coercion, duress, or undue influence. Finally, it is also determined as a matter of law, that, on the circumstances of this case, the 1970 trust is valid despite a failure by plaintiff to read the trust agree-

ment before signing it. In view of the above determinations, it is held that plaintiff incurred federal gift tax liability when he executed the 1970 trust agreement on April 10, 1970. The extent of plaintiff's liability is a disputed issue of fact and remains to be resolved at trial unless the parties are able to resolve the matter and avoid litigation.

For the reasons discussed above, it is concluded plaintiff is not entitled to recover. Accordingly, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. Only the question of valuation of plaintiff's remainder interest in the 1970 trust remains as a viable issue in this case. The parties are directed to advise the court within thirty (30) days from the date of this opinion whether a trial on the valuation of the gift will be necessary.